**Fred HUBER, Plaintiff-Appellant,**

v.

**AMERICAN PRESIDENT LINES, Limited, Defendant-Appellee.**

**No. 97, Docket 24183.**

United States Court of Appeals
Second Circuit.

Argued Dec. 14, 1956.

Decided Feb. 6, 1957.

Jacob Rassner, New York City, Dorothy Kelleher Meehan, New York City, on the brief, for appellant.

Symmers, Fish, Warner & Nicol, New York City, William G. Symmers, William Warner and William A. Wilson, New York City, of counsel, for appellee.

Before SWAN, MEDINA and WATERMAN, Circuit Judges.

SWAN, Circuit Judge.

Appellant, a seaman employed on a vessel of the appellee, brought this action under the Jones Act, 46 U.S.C.A. § 688, and the general maritime law to recover for personal injuries sustained in a fall on a catwalk constructed to make possible passage along the deck without climbing over deck cargo. A jury trial was waived. On motion of the defendant, the court dismissed the complaint at the close of the plaintiff's evidence. Findings of fact were made in Judge Walsh's (unreported) opinion. The appeal challenges the power of the court to weigh the evidence and decide on the merits at the close of the plaintiff's case, and attacks as clearly erroneous certain of the court's findings of fact and its conclusion that neither unseaworthiness of the vessel nor negligence of the defendant caused the plaintiff's injuries.

■■■ The contention that the district judge was not empowered to dismiss on the merits under Rule 41(b), Fed.Rules Civ.Proc., 28 U.S.C.A., because the evidence established a prima facie case that would have precluded a directed verdict for the defendant in a jury trial, is without merit. The 1946 amendment to the Rule eliminated any doubt which might previously have existed.[1]

In October 1952, appellant shipped as bo'sun on the appellee's vessel President Arthur. The vessel proceeded from the port of New York to Wilmington, California, the port of Los Angeles. On October 24, 1952 while she was still tied to her pier at Wilmington appellant, in walking aft along the catwalk, sustained a fall. At the time of the accident all concerned thought he had merely sprained his left ankle, and he did not ask to be relieved from duty. Several weeks later, at the port of Yokohama, it was discovered that he had fractured a bone. He continued with the ship until her return to New York. On July 9, 1953 he brought this action, which was tried in November 1955. Judgment of dismissal was entered January 27, 1956.

■■ The appellant's testimony was to the effect that his fall was caused by tripping over a wire protruding near the edge of the catwalk and not seen by him because of inadequate lighting of the catwalk. He admitted that the vessel was then tied to the pier. Judge Walsh's opinion finds that the vessel "actually left the pier at 6:16 or thereabouts"; that "the defendant had the light which you have customarily during the last hour of daylight on a fall day"; and "I do not accept any testimony that it was dark." These findings the appellant claims are unsupportable.

As to the first, he asserts that the vessel left the pier at 7:15. For this he relies upon the vessel's log book which records her "departure" from the port of Los Angeles at 7:15. But "departure" is not synonymous with undocking.[2] The log shows that the undocking tug was made fast alongside at 6:03, at which time the vessel's lines to the dock were singled up, and at 6:20 she was under way with all her lines on board. The finding as to when she left the pier is correct.

Appellant's argument that the court erred in finding it was not dark when

1. 5 Moore, Federal Practice, 2nd Ed., Par. 41.14(3) and (4); Allred v. Sasser, 7 Cir., 170 F.2d 233; United States v. Borden Co., D.C., N.D.Ill., 111 F.Supp. 562; Brahms v. Moore-McCormack Lines, D.C., S.D.N.Y., 133 F.Supp. 283.

2. Dutton, Navigation and Nautical Astronomy, United States Naval Institute, 1948, Section 1609; "Taking departure—When a ship leaving port has cleared the channels and is ready to set out upon the open sea, the navigator determines a last accurate position by landmarks before they are lost to view. This may be done by passing close aboard an aid to navigation, such as a lightship or buoy, or by any other method of obtaining a fix.

"When the last position by landmarks is thus determined and the open sea course is set, the ship is said to *take departure*. The data by which the position was determined, and the time, are entered in the ship's log."

the accident happened is based on the report of the Los Angeles Weather Bureau that on October 24, 1952 the sun set at 5:09 P.M., and twilight continued for only 25 minutes. But, as demonstrated in the appellee's brief, although "civil" twilight ended at 5:34 P.M., "astronomical" twilight ended one hour and twenty-four minutes after sunset. Hence darkness did not set in until 6:33 P.M., which was at least fifteen minutes after the accident, since that happened while the vessel was still tied to her pier. The accident may have happened some time before the vessel left her pier "at 6:16 or thereabouts." The plaintiff testified that when he tripped over the protruding wire he fell into an eight-foot break in the catwalk, this portion having been removed to facilitate handling the ship's gear. If he fell into the temporary break in the catwalk, the accident happened before 5 P.M. for the mate's testimony in a deposition, which the plaintiff introduced, was that he inspected the after deck between four and five o'clock and saw the catwalk in place and the hatches and gear secured. We cannot say that the finding that it was not dark when the accident occurred is clearly erroneous.

As to the existence of the wire over which appellant says he tripped, the court said: "I think I will take the plaintiff's testimony that the wire did go through the catwalk about six inches from the outboard side." The catwalk was thirty inches wide and had a handrail along the outboard side. The court with some reluctance also made a finding that the plaintiff did trip over it. Appellant contends that the existence of the wire proved the ship unseaworthy. As to this the court said:

"I shall hold, however, that the existence of that wire going through the edge of the catwalk, did not render the ship unseaworthy, nor was there negligence on the part of the defendant. The catwalk was not a permanent part of the ship; it was a temporary structure to be used only by the crew, men who are trained to handle themselves and keep their footing in fairly precarious places. To say that a vessel, as a matter of law, must so build its catwalk that none of the wires holding her deck cargo in place may go through the edge of the catwalk, is something that I cannot do on the record in this case."

In disputing this conclusion appellant cites three cases.[3] None is at all analogous to the case at bar. Here no piece of equipment broke, and there was no testimony that comparable vessels construct catwalks without allowing a wire to protrude six inches into a catwalk thirty inches wide.[4] The catwalk was provided with a handrail; there was adequate light to see the wire, and there were twenty-four inches of clear space between the wire and the other edge of the catwalk. In the absence of testimony that the wire made the catwalk dangerous or that good seamanship forbids running a wire through the edge of a catwalk, we think Judge Walsh was correct in holding that neither unseaworthiness nor negligence was proved. Judgment affirmed.

3. Petterson v. Alaska S.S. Co., 9 Cir., 205 F.2d 478, affirmed 347 U.S. 396, 74 S. Ct. 601, 98 L.Ed. 798; Poignant v. United States, 2 Cir., 225 F.2d 595; Dixon v. United States, 2 Cir., 219 F.2d 10.

4. Cf. Poignant v. United States, supra, 225 P.2d at page 598 where the court refers to testimony that comparable vessels generally are provided with garbage chutes.