**Edward WHITE and North American Research & Development Corporation, Plaintiffs,**

v.

**Edward C. JAEGERMAN et al., Defendants.**

**No. 69 Civ. 1276.**

United States District Court, S. D. New York.

March 3, 1975.

of the Ontario Securities Commission. The complaint alleges that the defendants conspired to and did intentionally injure and maliciously harass the plaintiffs, and seeks damages in the amount of $10 million. The action was removed to this Court pursuant to 28 U.S.C. § 1442.

By Opinion filed October 9, 1969, Judge McLean granted motions for summary judgment dismissing the complaint as to all the Commission defendants, except Jaegerman, finding that since the acts of which plaintiffs complained were performed by these defendants in the course of their official duties, they were immune from suit. As to Jaegerman, Judge McLean held that although many of plaintiffs' claims appeared to be related to matters within the scope of Jaegerman's immunity, a question of fact existed with respect to Jaegerman's alleged communication of information to Metz.

■ Defendant Bray was not served, and the action against Metz was dismissed by consent on May 1, 1974. Plaintiffs' case against Jaegerman was tried by the Court without a jury on October 2 and 3, 1974. After completion of plaintiffs' case, Jaegerman moved to dismiss the complaint pursuant to F.R.Civ. P. 41(b). Under F.R.Civ.P. 41(b) this Court has the power to decide the case on the merits and, unlike a jury case, need not consider plaintiffs' evidence in a light most favorable to plaintiffs. 5 J. Moore, Federal Practice ¶ 41.13[3], at 1155 (2d ed. 1974). See also Huber v. American President Lines, 240 F.2d 778, 779 (2d Cir. 1957). Nevertheless, in reaching the decision hereinafter set forth, the Court has interpreted the evidence in a light most favorable to plaintiffs.

Plaintiffs characterize their claims against Jaegerman as "harassment" and violation of civil rights. However, they have not cited any legal authority which supports recovery of damages on such theories in the factual context of the present action.

Sidney Schreiberg, New York City, for plaintiffs.

Roger M. Dietz, Special Trial Counsel New York Regional Office, SEC, New York City, Lawrence E. Nerheim, David Ferber, David J. Romanski, David K. Ginn, SEC, Washington, D. C., for defendant Jaegerman.

OPINION

BONSAL, District Judge.

Plaintiffs Edward White and North American Research & Development Corporation ("North American"), of which White is or was the majority stockholder, commenced this action in New York State Supreme Court, New York County against eight present or former employees of the Securities and Exchange Commission ("Commission"), together with Robert Metz, a reporter for the New York Times, and Harry Bray, director

In 1967 Jaegerman was Chief Investigative Counsel for the Commission. On July 19, 1967 he received an anonymous phone call advising him that White and a group of Canadian stockbrokers were engaged in perpetrating a stock fraud in the United States. As a result of the investigation by Jaegerman and others on the staff, the Commission suspended trading in North American stock on July 20, 1967. The scheme to sell unregistered North American stock in the United States is detailed in Securities and Exchange Commission v. North American Research and Development Corp., 280 F.Supp. 106 (S.D.N.Y.1968), affirmed as to White and North American, 424 F.2d 63 (2d Cir. 1970). White and North American were eventually found to have violated the registration and antifraud provisions of the securities acts and were permanently enjoined from future violations of these acts. Securities and Exchange Commission v. North American Research and Development Corp., 375 F.Supp. 465 (S.D.N.Y.1974), appeal docketed, No. 74–1750, 2d Cir., June 3, 1974.

■■ An official of the federal government charged with duties which require the exercise of discretion is immune from damage suits for action taken within the scope of his authority. Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Galella v. Onassis, 487 F.2d 986 (2d Cir. 1973); Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655 (2d Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050 (1963); Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). To sustain their claims against Jaegerman, plaintiffs must therefore show that he acted outside the limits of the broad investigative responsibilities with which he was charged. See 17 C.F.R. § 202.5 (a). Plaintiffs have attempted to make such a showing by introducing evidence on six incidents of alleged "harassment."

*"Leaking" of Nonpublic Information to Metz*

Since approximately 1966, Metz has written a financial column in the New York Times called "Market Place." Relying primarily on Metz's column of August 1, 1967, plaintiffs contend that Jaegerman "leaked" to Metz nonpublic and false information about North American in violation of plaintiffs' rights. Plaintiffs concede that Metz's subsequent columns on North American "are sometimes repetitious and contain some material not originating with Jaegerman." Plaintiffs' Post-Trial Memorandum, at 9.

Sometime prior to August 1, 1967, Terry Robards, another reporter for the Times, advised Metz that trading in North American stock had been suspended and suggested that it might be worth following up. Robards had earlier recommended Jaegerman as a source of information, and Metz had spoken to Jaegerman a number of times prior to discussing matters relating to North American.

On or about July 31, 1967, Metz called Jaegerman to inquire about North American. At his deposition, Metz testified that Jaegerman provided factual information for the August 1 column and that during their conversation Jaegerman indicated that he was referring to "official papers" which he had in the case. However, Metz also testified that in addition to Jaegerman, there may have been another source for the August 1 column, whose name Metz refused to disclose, and that prior to writing the column he may have seen a brochure distributed by North American.

Although Commission regulations denominate certain matters as nonpublic, see e. g. 17 C.F.R. §§ 203.2, 203.5, members of the Commission's staff have authority to render advice and assistance to members of the public. See e. g. 17 C.F.R. § 202.1(d). Since protection of investors against fraudulent schemes would appear to be one object of such authority, members of the Commission's staff must necessarily exercise discre-

tion as to matters which may be disclosed in an effort to safeguard the public. Neither the testimony of Metz as to the information furnished him by Jaegerman nor a reading of the Metz columns indicates that Jaegerman provided Metz with nonpublic information or otherwise abused his discretion.

■ However, even if Jaegerman did "leak" nonpublic information to Metz, plaintiffs have not shown any basis for recovery of damages. The truth of the matters contained in the Metz articles having been established in the Commission's injunctive action against White and North American, plaintiffs concede not only that they have no basis for recovery on a theory of defamation, but also "that if the instant case is narrowed to the Jaegerman—Metz transactions, it would become moot." Plaintiffs' Memorandum of Law, at 5. Moreover, other than possible injury to reputation, plaintiffs' have not established that they suffered any damages as a result of any "leaking" of information by Jaegerman to Metz. Trading in North American stock had been suspended by the Commission prior to the publication of the Metz articles and was not permitted to resume until after the Commission had obtained preliminary injunctions against White and North American. In addition, Metz testified that his information that brokers were cancelling transactions in North American stock may not have come from Jaegerman.

*"Intimidation" of Haskins & Sells*

In June 1967 the accounting firm of Haskins & Sells was retained to audit the books of North American. A report dated August 18, 1967 was prepared and delivered to North American, but was later withdrawn. Plaintiffs contend that Jaegerman intimidated Haskins & Sells into withdrawing the report.

Merwyn Schulman, a staff accountant for the Commission, testified at his deposition that on or about September 25, 1967 he was present at a meeting attended by members of the Commission's staff, including Jaegerman, and representatives of North American. At the meeting, North American's financial statements, including the Haskins & Sells report, were discussed. Concerned with the propriety of writing up a plant to appraisal value in the financial statements and in an attempt to get more information, Schulman called Robert Nelson, a Haskins & Sells partner in Salt Lake City. Schulman testified that during the conversation he asked Nelson whether consideration had been given to withdrawing from the engagement or expressing an adverse opinion, but that he never made a direct suggestion that Haskins & Sells withdraw from the engagement.

Oscar Gellein, who in 1967 was a partner of Haskins & Sells working in New York, testified at trial that he had a call concerning North American from Andrew Barr, who at the time was the Commission's chief accountant. Gellein testified that he told Barr that the balance sheet in the Haskins & Sells report was based on the assumption that the transactions between the parties for the various assets and stock issues were at arm's length and that if the transactions were not at arm's length it would make a difference. Barr in reply suggested that perhaps the transactions were not at arm's length, and Gellein indicated that Haskins & Sells would look into it. Gellein testified that Barr never asked him to withdraw from the engagement and that he had never spoken to Jaegerman. According to Gellein, the report was withdrawn because developing circumstances, such as the filing of a Commission injunctive action against North American and Barr's inquiry, led Haskins & Sells to believe that further investigation was necessary.

Edward Darcey, another Haskins & Sells partner, testified at trial that he had no conversations with the Commission about the report prepared for North American and that he did not know of any oral or written requests from the Commission that Haskins & Sells withdraw the report. Darcey also

testified that he never had any communications with Jaegerman.

## Wee-Gee Uranium Mines Ltd.

Wee-Gee Uranium Mines Ltd. ("Wee-Gee") is or was a Canadian company of which White is or was president and a director. Plaintiffs contend that Jaegerman improperly directed that Wee-Gee be placed on the Commission's Foreign Restricted List. The Foreign Restricted List was a list of foreign companies whose securities the Commission had reason to believe were being distributed in the United States in violation of the registration provisions of the Securities Act of 1933.

Jaegerman testified at trial that at the request of Bray, he went to Toronto to discuss White and North American with Bray and two lawyers from the Ontario Securities Commission, and that while in Toronto he was given information about Wee-Gee. Jaegerman further testified that he was aware that unregistered Wee-Gee stock was trading in the United States and that based on a staff report he recommended that Wee-Gee be placed on the Foreign Restricted List.

In 1968 Errol Stone was the Commission's Foreign Liaison Officer and as such was responsible for developing, coordinating, and investigating possible frauds or unregistered distributions emanating from without the United States, particularly from Canada. Stone testified at his deposition that he was alerted to possible problems with Wee-Gee by the Ontario Securities Commission. About the same time, Jaegerman informed Stone orally that Wee-Gee was being distributed in the United States and asked Stone to write a memorandum for the purpose of placing Wee-Gee on the Foreign Restricted List. Stone testified that after consulting with his superior, he requested Jaegerman to provide him with a memorandum containing all the facts. After receiving the memorandum, Stone did independent research to verify the facts and wrote a memorandum recommending that Wee-Gee be placed on the Foreign Restricted List. Except for using others more to verify the facts, Stone testified that he followed the same procedure with respect to Wee-Gee as he did with respect to any other company. The Commission placed Wee-Gee on the Foreign Restricted List on March 26, 1968.

## "Intimidation" of Burnett

Jaegerman testified that in the course of his inquiry into North American on July 19, 1967, he checked the "pink sheets," which reflect bid and ask quotations for securities traded in the over-the-counter market. Jaergerman noted that a number of broker-dealers had been quoting North American stock and that the stock had realized a rapid price rise. Jaegerman called the National Quotation Bureau ("Bureau"), publisher of the "pink sheets," and spoke to David M. Burnett, an officer of the Bureau. Burnett indicated that the Bureau had a file on North American, and personally brought the file to Jaegerman's office.

Burnett testified at trial that he was interested in the North American situation and sat and spoke with Jaegerman about it. According to Burnett, Jaegerman stated that he felt there was an illegal distribution of North American stock and asked Burnett whether North American could be removed from the "pink sheets." Burnett told Jaegerman this could not be done because the sheets had already gone to press. Burnett testified that Jaegerman then asked whether there was anything Burnett could do to protect the public from what Jaegerman believed to be an illegal distribution. Burnett suggested that the only thing he could do would be to call the Bureau customers who were dealing in North American stock and tell them that the issue was under surveillance. Those customers could then take whatever measures they deemed advisable. According to Burnett, Jaegerman reacted affirmatively to this suggestion, but never asked Burnett to call the Bureau's customers.

## "Intimidation" of Gould

Jaegerman testified that after speaking with the anonymous caller on July 19, 1967, he checked, at the suggestion of the caller, a market letter put out by Philip Gould, known as Gould's Position. Finding that North American stock was being recommended in a recent issue, Jaegerman called Gould and arranged to meet him that evening.

Jaegerman came to Gould's office at about 7 o'clock. Gould testified at trial that Jaegerman asked him some questions about White and North American. Gould indicated to Jaegerman that he was alerted to North American by a telephone call from someone in Texas who said he was an engineer, and that Gould's recommendation of North American was based on a brochure about a method of eliminating sulphur from coal, general information about the usefulness of such a process, and a check of the "pink sheets." According to Gould, Jaegerman then stated something to the effect that "the company did not have a prayer, that the stock had been selling at a penny, and some speculators were running it up," (Trial Transcript, at 183) and indicated to Gould that he had better do something about correcting his recommendation. Gould testified that he immediately agreed with Jaegerman because he realized that he "had not gotten the financial background of the company" and that he "had not given it the kind of investigation that the SEC generally requires." (Trial Transcript, at 183, 184.) Gould further testified that he stated or hinted to Jaegerman that the recommendation would be retracted, and that the recommendation was retracted some two weeks later.

## "Intimidation" of Judy Cannon

Although not alleged in the complaint, plaintiffs introduced evidence at trial attempting to show that Judy Cannon, allegedly an important witness in the Commission's injunctive action against plaintiffs, was intimidated by Jaegerman into giving testimony in court more damaging than statements which she had previously made to Charles Snow, formerly a lawyer with the Commission. However, Snow testified at trial that he interrogated Cannon on the evening before she testified in the injunctive action and that there was no significant disparity between what Cannon had told Snow and Cannon's court testimony. There is no evidence that Jaegerman had anything to do with Cannon's testimony.

■ With respect to each of the incidents of alleged "harassment" reviewed above, plaintiffs have not only failed to show that Jaegerman acted outside the scope of his authority, but they have also failed to sustain their charges of "intimidation" and improper conduct. Accordingly, Jaegerman's motion to dismiss the complaint is granted. Plaintiffs' motion to reopen the trial for further testimony is denied.

The foregoing constitutes the Court's findings of fact and conclusions of law. F.R.Civ.P. 41(b), 52(a).

Settle judgment on notice.