### In re MIAMI GENERAL HOSPITAL, INC., Debtor.

**Gui L.P. GOVEART, Trustee, Miami General Hospital, Inc., Plaintiff,**

v.

**CAPITAL BANK, Defendant.**

**CAPITAL BANK, a Florida banking corporation, Third Party Plaintiff,**

v.

**1ST AMERICAN BANK AND TRUST COMPANY, Third Party Defendant.**

Bankruptcy No. 87–02131–BKC–AJC. Adv. No. 89–0265–BKC–AJC–A.

United States Bankruptcy Court, S.D. Florida.

Feb. 19, 1991.

Michael W. Ullman, Ullman & Ullman, North Miami, Fla., for Capital Bank.

Joseph A. Gassen, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for trustee.

Robert Soriano, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for FDIC, Rcvr. for 1st American Bank & Trust Co.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

A. JAY CRISTOL, Bankruptcy Judge.

This cause came on for trial before the Court on the 1st, 2nd, 3rd and 16th days of November, 1990, and the 20th day of December, 1990 upon the Plaintiff's Complaint which seeks this Court to declare that CAPITAL BANK received a voidable fraudulent conveyance from the debtor as the result of the repayment of a loan. At the conclusion of Plaintiff's case CAPITAL BANK made an *ore tenus* Motion for Involuntary Dismissal in accordance with Rule 41 of the Federal Rules of Civil Procedure as that Rule is made applicable by Rule 7041 of the Bankruptcy Rules of Procedure. CAPITAL BANK's *ore tenus* Motion for Involuntary Dismissal was subsequently supported by a written Motion for Involuntary Dismissal and supporting memorandum of law. The Court has elected not to concentrate on the issue of solvency or the existence of a creditor body prejudiced or defrauded by the subject transfer for the purpose of this Order. Instead, the Court's main concern with reference to the merits of the Plaintiff's case and CAPITAL BANK's Motion for Involuntary Dismissal is whether there was adequate consideration for the alleged fraudulent conveyance that is at issue in this case. The Court heard testimony, examined the evidence and stipulations presented, observed the candor and demeanor of the witnesses, considered the arguments of counsel and being otherwise fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

### I. FINDINGS OF FACT

1. The Trustee in this case was appointed on July 1, 1987 [Trial Transcript of November 1, 1990 at page 50].

2. On or about July 31, 1985, CAPITAL BANK was repaid for three loans, through the use of wire-transfer facilities, the total sum of $3,568,806.35. The borrowers names were 34 Biscayne Corp. (Loan No: 8025124–9001), Associated Doctors Hospital Inc., later known as Miami General Hospital, Inc. (Loan No: 3299526–5001) and Recarey Enterprises, Inc. (Loan No: 7292329–5002) [Plaintiff's Exhibit 27]. It is the latter repayment of a loan, in which

---

1. Bracketed references are to the supporting record and/or documents in evidence.

Recarey Enterprises, Inc. was the borrower, that the Trustee asserts constitutes the fraudulent conveyance *sub judice*. The Trustee argues that the debtor was not obligated to pay Recarey Enterprises, Inc.'s obligation, that there was no consideration for the repayment and, therefore, CAPITAL BANK's receipt of the repayment constituted a fraud on creditors.

3. Exhibit 33 which is comprised of loan documentation that the Trustee introduced into evidence indicates that First American Bank and Trust Company loaned some $14,400,000.00 to Miami General Hospital, Inc. 34 Biscayne Corp. and International Medical Centers, Inc. First American Bank and Trust Company received guaranty agreements from various affiliated entities including Recarey Enterprises, Inc., International Medical Centers, Inc., Miguel Recarey, Jr. and additional guarantors referenced in Exhibit 33 as listed on Exhibit H thereto. It was also granted a first lien and security interest in all personal property of 34 Biscayne Corp., a first lien and security interest in all personal property of Miami General Hospital, Inc., which was not already subject to a security interest by co-trustees under an indenture agreement, together with a second lien and security interest in all such property subject to the indenture of Miami General Hospital, Inc., a second mortgage and assignment of leases in and to the real estate and improvements described in and pursuant to a mortgage executed and delivered to the lender by Miami General Hospital, Inc., a first mortgage and assignment of leases in and to certain real estate and improvements described in and pursuant to a mortgage executed and delivered to the lender by 34 Biscayne Corp., a collateral assignment of all rents, income and rights under all operating agreements relating to the use of a portion of Miami General Hospitals Inc.'s facilities and various other property that was more specifically described in Exhibit 33 [Plaintiff's Exhibit 33].

4. On July 29, 1985, the law firm of Male and Simon wrote to the First American Bank and Trust Company. The letter recites that Male and Simon had acted as counsel to both International Medical Centers, Inc. and Recarey Enterprises, Inc. in connection with a stock purchase agreement and that the loan to First American Bank and Trust Company would be a violation of their representations which were made to First American Bank and Trust Company since the First American Bank and Trust Company loan would result in a breach of the provisions of the Credit Agreement dated December 23, 1983 by and between Recarey Enterprises, Inc. and CAPITAL BANK, of which International Medical Centers, Inc. was a guarantor. In his letter, Mr. Male specifically states, however, that it is his understanding that a *condition to funding the June 29, 1985 revolving loan agreement* between Miami General Hospital, Inc., as borrower, and First American Bank and Trust Company, *was that the CAPITAL BANK loans were to be paid off. At such time as the CAPITAL BANK loans were paid off, any restrictions contained in such Credit Agreement would terminate and no longer would be of any force and effect.* [Plaintiff's Exhibit 41].

5. At the time of repayment, Ronald L. Murphin, executive vice president of First American Bank and Trust Company, notified International Medical Centers, Inc., more specifically Steven E. Cohen, that the $3,568,806.35 paid to CAPITAL BANK was wire-transferred *from the International Medical Centers, Inc. account* [Plaintiff's Exhibit 32].

6. Not only did First American Bank and Trust Company's representative indicate that the transfer was made out of International Medical Center, Inc.'s account, the wire-transfer received by CAPITAL BANK likewise indicated that payment was made by "order of ... International Medical Center General Operating Account ..." [Plaintiff's Exhibit 47].

7. Some six months prior to the repayment, in December of 1984, Recarey Enterprises, Inc. asked CAPITAL BANK to restructure an existing Credit Agreement between the Recarey Group entities and CAPITAL BANK. Recarey Enterprises, Inc.'s goal was to have its stock interests in Miami General Hospital, Inc., formerly

pledged to CAPITAL BANK pursuant to an original Credit Agreement dated December 23, 1983, released from the pledge so as to enable Recarey Enterprises, Inc. to sell its stock to its subsidiary, International Medical Centers, Inc., for $4.8 million, thereby enabling International Medical Centers, Inc. to cure what the Department of Insurance considered a capital deficiency [Plaintiff's Exhibit 19].

8. This restructuring resulted in a further modification to an original $2.4 million line of credit CAPITAL BANK extended to Recarey Enterprises, Inc. which was used by Recarey Enterprises, Inc., to acquire up to forty-four percent (44%) of the issued and outstanding stock of Associated Doctors Hospital, Inc., which later became known as Miami General Hospital, Inc. The acquisition was effected pursuant to a merger between Associated Doctors Hospital, Inc. and Miami General Hospital, Inc., a wholly owned subsidiary. As security for the loan, Miguel Recarey, Jr., his wife Olga, and International Medical Centers, Inc. guaranteed the loan. Additionally, one hundred percent of all issued and outstanding stock of Recarey Enterprises, Inc. and Miami General Hospital, Inc. was pledged to CAPITAL BANK after the merger [Plaintiff's Exhibit 24].

9. On March 30, 1984, an Amending Agreement was executed between CAPITAL BANK and Recarey Enterprises, Inc., which amended the original Credit Agreement of December 23, 1983. As recited in the Amending Agreement, Associated Doctors Hospital, Inc. had been given a line of credit of up to $2.4 million. At the time of the Amending Agreement, Recarey Enterprises, Inc. and Miami General Hospital, Inc. acknowledged that there was an outstanding principal balance of $1,400,000.00 owed by Miami General Hospital, Inc. to CAPITAL BANK. The Amending Agreement provided that in accordance with the original Credit Agreement and Plan of Merger dated December 23, 1983, Associated Doctors Hospital, Inc., merged with Miami General Hospital, Inc., whereby Associated Doctors Hospital, Inc. became the surviving entity and changed its name to Miami General Hospital, Inc. Furthermore,

Recarey Enterprises, Inc. received ownership of all of the issued and outstanding stock of Miami General Hospital, Inc. Pursuant to the terms of the original Credit Agreement, Recarey Enterprises, Inc. could borrow up to $2,400,000.00. Thereafter, under the Amending Agreement, the line of credit was restructured to provide that Recarey Enterprises, Inc. could increase its credit line from the then $2,400,000.00 ceiling to $3,800,000.00. This increase of $1.4 million, was equal to and was used to satisfy one of two outstanding obligations then owed by Miami General Hospital, Inc. to CAPITAL BANK.

10. The repayment of this very obligation is what the Trustee now asserts constituted a fraud on creditors. The Trustee avers that there was no consideration given to Miami General Hospital, Inc. by CAPITAL BANK, notwithstanding that the repayment of loan that is the basis of the Trustee's suit arose out of a loan originally made to Miami General Hospital, Inc. It was only after its affiliate, Recarey Enterprises, Inc., incurred a greater obligation to CAPITAL BANK, that Miami General Hospital, Inc. was replaced as the obligor of this indebtedness to CAPITAL BANK [Plaintiff's Exhibit 75].

11. This consolidated loan arrangement was not concluded until June 5, 1984, at which time Recarey Enterprises, Inc. was notified by CAPITAL BANK that the obligations of $1,400,000.00 and $500,000.00, which amounted to a total of $1,900,000.00, was now outstanding under the $3,800,000.00 non-revolving line of credit pursuant to the Amending Agreement. CAPITAL BANK requested that the documentation be completed with reference to the March 30, 1984 Amending Agreement, and that all payments be made including the revised payment schedule of $83,333.00 plus interest which was payable monthly commencing June 23, 1984. Upon Recarey Enterprises, Inc.'s receipt of this notice from CAPITAL BANK reciting that Recarey Enterprises, Inc. did not have sufficient funds in its account to satisfy the total arrearages due of $209,116.30, Miguel Recarey, Jr. and Eddie Fernandez authorized CAPITAL

BANK to withdraw and transfer $209,-116.30 from the regular operating account of Associated Doctors Hospital, Inc. (account number 0101035683), no longer the direct obligor, and transfer same to the account of Recarey Enterprises, Inc. (account number 0800005880), notwithstanding the fact that Miami General Hospital, Inc. had been replaced as an obligor on the loan [Plaintiff's Exhibit 77].

12. Ultimately, a Second Amending Agreement dated December 31, 1984, was executed between CAPITAL BANK on the one hand, and Recarey Enterprises, Inc., Miami General Hospital, Inc., and International Medical Centers, Inc. on the other hand. Therein, the Credit Agreement of December 23, 1983 and Amending Agreement of March 30, 1984 were referenced and the parties acknowledged, *inter alia,* that Recarey Enterprises, Inc. and International Medical Centers, Inc. had entered into a stock purchase agreement on September 30, 1984, under which Recarey Enterprises, Inc. was to transfer to International Medical Centers, Inc. its stock interest in Miami General Hospital, Inc., for $4.8 million which represented eighty percent (80%) of the then issued and outstanding shares of stock of Miami General Hospital, Inc. The sale to International Medical Centers, Inc. was to enable Recarey Enterprises, Inc. to apply the $4.8 million received from International Medical Centers, Inc. to the partial repayment of the loan from Miami General Hospital, Inc. to Recarey Enterprises, Inc. in the amount of $6 million. Miami General Hospital, Inc. was then to apply the $4.8 million received from Recarey Enterprises, Inc. to the partial repayment of a receivable from International Medical Centers, Inc. to Miami General Hospital, Inc., in the amount of $6 million. The Florida Department of Insurance which regulated International Medical Centers, Inc. because it was a health maintenance organization, approved the transaction, sale and conveyance and CAPITAL BANK consented to the transfer of the stock [Plaintiff's Exhibits 19 and 83].

13. No record evidence exists that Associated Doctors Hospital, Inc., failed to receive $1,400,000.00 from CAPITAL BANK, or that it did not benefit as a result thereof, and it was the balance of this very obligation that was subsequently repaid. In other words, Recarey Enterprises, Inc.'s debt that was increased by $1.4 million to satisfy one of two debts Miami General Hospital, Inc. owed to CAPITAL BANK, and for which Miami General Hospital, Inc. received the direct benefit, is the basis upon which the Trustee avers CAPITAL BANK received a fraudulent conveyance [Trial Transcript of November 2, 1990 at pages 101 and 102].

14. Furthermore, this Court cannot help but focus on the inter-relationship and interplay among Recarey Enterprises, Inc., International Medical Centers, Inc., and Miami General Hospital, Inc. CAPITAL BANK does not contend that these companies' corporate veils should be pierced. Piercing these affiliated companies' corporate veils is not required, however, in order to establish the validity of CAPITAL BANK's receipt of a repayment of a loan from an affiliate of Recarey Enterprises, Inc., even if the affiliate was not directly obligated for the repayment of that loan at the time of repayment. The court has focused on the economic realities and identity of interests of these affiliated companies and their relationships in order to determine whether these affiliated companies were so closely connected that they should be considered an "economic unit" or possess such "identity of interests" so as to enable CAPITAL BANK to receive an unavoidable payment by an affiliate of the obligated entity so long as there is an adequate indirect benefit to the debtor.

15. Hugh McNew, Esq., an attorney licensed to practice in Florida, acted as general counsel not only for International Medical Centers, Inc., but also for Miami General Hospital, Inc. He was later made senior vice president of International Medical Centers, Inc. [November 1, 1990 Trial Transcript, page 86].

16. As senior vice president and general counsel of both International Medical Centers, Inc. and Miami General Hospital, Inc., Mr. McNew also maintained the corporate books and records for not only the compa-

nies he represented, but in addition, on behalf of the parent company, Recarey Enterprises, Inc. [Trial Transcript of November 1, 1990 at page 90].

17. Although Mr. McNew stated that these three companies maintained separate books and records, he himself admitted that Recarey Enterprises, Inc., International Medical Centers, Inc. and Miami General Hospital, Inc. had a symbiotic relationship to the extent that International Medical Centers, Inc. had patients to refer and Miami General Hospital, Inc. had beds that needed these patients. He also stated that there was a symbiotic relationship among these entities to the extent that Recarey Enterprises, Inc. owned and ran corporations which provided medical specialists to *both* International Medical Centers, Inc. and Miami General Hospital, Inc. [Trial Transcript of November 1, 1990 at page 92].

18. Michael Male, Esq. also testified that he acted as counsel to Recarey Enterprises, Inc., International Medical Centers, Inc. and Miami General Hospital, Inc. from 1970 through 1986 [Trial Transcript of November 2, 1990 at pages 5 and 6]. Michael Male's testimony described the surrounding circumstances of the loan to First American Bank and Trust Company and repayment of funds to CAPITAL BANK which is the basis for the alleged fraudulent conveyance. He explained that in 1985 the Department of Insurance was requiring International Medical Centers, Inc. to increase its cash position and working capital to maintain its standing with the Department of Insurance. A deadline of June 30, 1985 was imposed by the Department of Insurance within which International Medical Centers, Inc. had to accomplish the above-described goal [Trial Transcript of November 2, 1990 at pages 9 and 10]. In order to meet the Department of Insurance regulatory requirements, International Medical Centers, Inc. determined it was necessary for it to close a loan and did so with First American Bank and Trust Company. The loan was closed in escrow by June 30, 1985, in order to meet the deadline imposed by the Department of Insurance, although the loan was not actually funded for some thirty days thereafter [Trial Transcript of November 2, 1990 at page 10]. Mr. Male testified that it was for International Medical Centers, Inc.'s benefit, as well as the group's benefit, that the entire loan be structured because of the former's need to meet Department of Insurance requirements. However, it was at the direction of First American Bank and Trust Company and with the consent of the Recarey Group that Miami General Hospital, Inc. was made a borrower and the loan was guaranteed by International Medical Centers, Inc. and Recarey Enterprises, Inc., as well as a whole host of affiliated entities all of which were part of the Recarey Group [Plaintiff's Exhibit 84 and Trial Transcript of November 2, 1990 at page 13]. When referencing the Plaintiff's Exhibits, Michael Male referred to Miami General Hospital, Inc., International Medical Centers, Inc., and Recarey Enterprises, Inc., as the "Recarey Enterprises Group of Companies" [Trial Transcript of November 2, 1990 at pages 18 and 19]. Those companies were more specifically detailed in a letter dated July 29, 1985, which Michael Male wrote to First American Bank and Trust Company in connection with the foregoing transaction. Therein Mr. Male indicated that he acted as counsel to Miami General Hospital, Inc., 34 Biscayne Corp., International Medical Centers, Inc., Recarey Enterprises, Inc., Miami General Pathologists, Inc., Associated Respiratory Therapists, Inc., Associated Radiologists, Inc., Associated Anesthesiologists Services, Inc., Associated Assistant Surgeons, Inc. and Associated Doctors Services, Inc., all of which were represented to be Florida corporations and all of which were to collectively be referred to as guarantors in connection with the credit and loan transaction with First American Bank and Trust Company [Plaintiff's Exhibit 40].*

19. Indeed, this Court noted that every entity in this "Recarey Group" was represented by the same individuals who signed

---

* Michael Male also testified that on various transactions on which Miami General Hospital was the borrower, cash flowed to and from International Medical Centers.

on each company's behalf with reference to the restructuring of the above-referenced obligations [Trial Transcript of November 2, 1990 at page 19]. Michael Male testified that "we kept changing them [the Recarey Companies] around for various reasons, there were ... dozens of companies." With reference to these companies it is also important to note that the same individuals were principally involved in each company's decision-making processes. For example, Steven Cohen was not only the executive vice president and director of International Medical Centers, Inc., but he was also the chief financial officer and director of Miami General Hospital, Inc. Similarly, Eddie Fernandez was not only chief operating officer and director of International Medical Centers, Inc., but he was also chief financial officer and director of Miami General Hospital, Inc. Likewise, Miguel Recarey a/k/a Mike Recarey was not only president, chief executive officer and director of International Medical Centers, Inc., but he was also president, chief executive officer and director of Miami General Hospital, Inc. [Trial Transcript of November 2, 1990 at pages 37, 38, 39, 40, 41 and 42].

20. Hugh McNew testified on cross-examination that although he performed work for Miami General Hospital, Inc., International Medical Centers, Inc., and Recarey Enterprises, Inc., his salary was paid exclusively by International Medical Centers, Inc. He also conceded that "a loan to one of the Recarey Group companies could ... have benefited the other companies." For instance, Mr. McNew noted that an upgrade of facilities or services by Miami General Hospital, Inc. would benefit the Health Maintenance Organization patients of International Medical Centers, Inc. Hugh McNew even admitted that the symbiotic relationship of International Medical Centers, Inc., Miami General Hospital, Inc., and Recarey Enterprises, Inc., was fostered by the exchange of medical specialists to Miami General Hospital, Inc. and International Medical Centers, Inc. He further testified that the Recarey Group would be benefited by International Medical Centers, Inc.'s buying power which would also directly benefit Miami General Hospital, Inc. [Trial Transcript of November 2, 1990 at pages 7, 8, 24, 25 and 26].

## II. CONCLUSIONS OF LAW

### A. APPLICABLE RULE AND AUTHORITY

Rule 41(b) of the Federal Rules of Civil Procedure provides in pertinent part:

After the plaintiff, *in an action tried by the court without a jury,* has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, *may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.* The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits [emphasis added].

When the defendant makes a Rule 41(b) motion to dismiss for insufficiency of the plaintiff's evidence, it becomes the duty of the court to *weigh* and *evaluate* the evidence. In *Hawkins v. Ohio Bell Telephone Company,* 93 F.R.D. 547 (S.D.Ohio 1982) the court wrote:

Fed.R.Civ.P. 41(b) provides that, in a non-jury trial, the defendant, after plaintiff's case has been presented, 'may move for a dismissal on the ground that upon the facts and the law, the plaintiff has shown no right to relief.' This procedure was clearly applicable to the instant case. Unlike a directed verdict in a jury trial, a Fed.R.Civ.P. 41(b) motion permits the ... trier of fact, to weigh the evidence and to consider the law at the close of the pre-

sentation of plaintiff's evidence. *Back v. Friden Calculating Machinery Co.*, 148 F.2d 407, 409–11 (6th Cir.1945); *5 Moore's Federal Practice*, § 41.18[4] at 41–198 (2d ed. 1981).

As stated in *United States v. American Telephone and Telegraph Co.*, 524 F.Supp. 1336 (D.C.1981), the Court's power as to a motion to dismiss under Rule 41 consists of a:

> ... grant [by this Rule, and judicial interpretations thereof], to the courts [of] considerable discretion in their treatment of motions to dismiss in non-jury cases. A court faced with Rule 41(b) motion— unlike one passing on a motion for a directed verdict in a jury case—is *not required to view the record in the light most favorable to the plaintiff, or to deny the motion if a prima facie case has been made out;* rather, *it is empowered to weigh and evaluate the evidence the plaintiff has presented and to grant the motion if it is convinced that, on the merits, the evidence preponderates against the plaintiff.* Ellis v. Carter, 328 F.2d 573, 577 (9th Cir.1964); *Island Service Co. v. Perez*, 309 F.2d 799, 803 (9th Cir.1962); *Huber v. American President Lines*, 240 F.2d 778 (2d Cir.1957) [emphasis added].

## B.  STANDARD OF REVIEW

A ruling granting a Motion for Involuntary Dismissal on the merits in accordance with Rule 41(b) requires that this Court make findings of fact, which findings are not to be set aside on appeal unless these findings are found to be clearly erroneous. *See, Weissinger v. United States*, 423 F.2d 795 (5th Cir.1970).[2]

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th cir. *en banc* 1981), the Eleventh Circuit Court of Appeals adopted all decisions of the former Fifth Circuit prior to October 1, 1981.

**3.** Chapter 726.01 of the Florida Statutes was repealed by laws 1987, Chapter 87–79, Section 13, effective January 1, 1988. It was originally enacted in January 28, 1823 under Section 1 of that law and was subsequently revised and modified by Revised Statutes 1892, Section 1991, General Statutes 1906, Section 2513, Revised General Statutes 1920, Section 3864, Compre-

## C.  ARGUMENT REGARDING THE SUBSTANTIVE LAW OF FRAUDULENT CONVEYANCE

### 1.  HISTORY

It has been said that "the framework of the fraudulent conveyance laws is fairly complex and ill-defined." These laws include portions of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act. These foregoing statutes were designed to protect unsecured creditors from conveyances that deplete a debtor's assets.

However, it is important that some legislative history or common law framework be discussed since the substantive law with reference to the cause of action brought in the instant case is *not* based upon any of the above-stated statutes—that is, the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, or the Uniform Fraudulent Transfer Act. Instead, this case is governed by what is known as the Statute of Elizabeth, better known in Florida as Florida Statute § 726.01.[3]

In England, during the 1500's, there was concern that a debtor could avoid paying his debts simply by transferring his assets to a friend or relative for a nominal sum. *See*, Baird and Jackson, *Fraudulent Conveyance Law and its Proper Domain*, 38 Vand.L.Rev. 829 (1985). Consequently, when the creditor demanded payment from the debtor, there were no assets to satisfy the creditor's claims. Eventually, either the creditor gave up on recovering the debt or settled for some lesser amount than that to which the creditor was entitled. *Ibid.* In 1570, the Statute of Elizabeth was

hensive General Laws 1927, Section 5771, and later laws 1945, Chapter 22858, Section 7. The new Uniform Fraudulent Transfer Act adopted by Florida under § 726.101, *et seq.* does not affect this case since the allegations contained within the Plaintiff's Complaint clearly establish that (1) the Plaintiff has not pled a cause of action under the new statute and (2) if a fraudulent conveyance were to have occurred, it would have to have been during the year 1985, and thus, it would have been governed by the law in existence at the time of the transfer.

passed to prevent the abuse described above. 13 Eliz., CH. 5 (1570). The basic prohibition of this statute prevents debtors from making transfers that "hinder, delay, or defraud" their creditors. Ever since the Statute of Elizabeth was enacted, the Courts have struggled to define transfers that hindered, delayed, or defrauded creditors. The Statute of Elizabeth focused on the bad intent of the debtor to avoid paying his obligations. One of the earliest and most well known cases dealing with the matter was *Twyne's case*, 3 Co. Rec. 806, 76 Eng.Rep. 809 (Star Chamber 1601). The *Twyne's case* described badges of fraud which were considered probative in proving *actual* subjective bad intent.

Those badges of fraud which were indicative of fraudulent intent will be more thoroughly discussed *infra*. However, of preliminary importance for the purposes of understanding the legislative history and the Statute of Elizabeth is the fact that it is, in fact, actual subjective bad intent that is the necessary requisite to be proven before a transfer can be deemed to have been fraudulent under the Statute of Elizabeth.[4]

## 2. THE APPLICABLE FLORIDA STATUTE

Florida Statute § 726.01 (1987) which prohibits fraudulent transfers and conveyances, remained substantially unchanged since 1823 until it was recently amended. *See, In re Piche*, 55 B.R. 339 (Bkrtcy.S.D. Fla.1985). This Florida Statute was basically a restatement of the law on fraudulent conveyances as declared by the Statute of Elizabeth. *See, Bayview Estates Corporation v. Southerland*, 114 Fla. 635, 154

So. 894 (1934). The statute reads, in relevant part, as follows:

> Every feoffment ... transfer and assignment ... by writing or otherwise, ... *made or executed, contrived or devised of fraud, covin, collusion or guile, to the end, purpose or intent to delay, hinder or defraud creditors* or others of their just and lawful actions, suits, debts ... shall be from henceforth as against the person or persons, ... so intended to be delayed, hindered or defrauded, deemed, held, adjudged and taken to be utterly void, frustrate and of none effect ... [emphasis added].

## 3. THE RELEVANT JUDICIAL AUTHORITY

As early as 1934, the Florida Supreme Court, in the case of *Bayview Estates Corporation v. Southerland*, 114 Fla. 635, 154 So. 894 (1934), addressed the requisite elements one must establish before a fraudulent conveyance may be proven and liability may be fixed on the transferee.

The Court recited the following three requisite elements for establishing a fraudulent conveyance:

> To constitute a fraudulent conveyance, there must be a creditor to be defrauded, a debtor intending fraud, and a conveyance of property which is applicable by law to the payment of the debt due.

*Southerland*, 154 So. at 900 [citation omitted]. *See also, Wieczoreck v. H & H Builders, Inc.*, 450 So.2d 867, 873 (Fla. 5th DCA 1984), *citing Southerland, supra.*

---

**4.** Because of the difficulty in proving actual subjective bad intent, in 1918 the National Conference of Commissioners on Uniform State Laws adopted the Uniform Fraudulent Conveyance Act, which enables a court to ignore actual fraudulent intent and look to constructive fraudulent intent. The elements generally required to violate the constructive fraudulent transfer laws are: (1) lack of fair consideration/reasonably equivalent value; and (2) any one of the following financial triggering events: (a) insolvency; (b) unreasonably small capital; or (c) the debtor intends to or believes he will incur debts beyond his ability to pay.

The Trustee could have utilized Bankruptcy Code § 548(a)(1) which, likewise, provides a right to institute a suit to avoid any transfer made with actual intent to hinder, delay, or defraud a creditor. However, § 548(a)(1) of the Bankruptcy Code limits the Trustee to avoiding transfers that occur *within* one year before the date of the filing of the petition. Accordingly, the Trustee in this case in pursuing CAPITAL BANK for the alleged receipt of a fraudulent conveyance, is forced to institute suit under § 544(b) of the Bankruptcy Code providing him with the opportunity to enjoy the longer state law statute of limitations, but obligating him to utilize *state* fraudulent conveyance laws in lieu of § 548(a).

### a. Intent and Badges of Fraud

In analyzing the above-stated elements, the Court in *Southerland, supra* stated:

A fraud upon creditors consists *in the intention by the debtor to prevent his creditors from recovering their just debts* by withdrawing his property from the reach of his creditors.

As the fraud rests upon the debtor's intent, *it must exist at the time of the transfer.*

*Southerland,* 154 So. at 900 [citations omitted and emphasis added].

In defining the requisite intent necessary under the statute and interpretive case law, the Court in *Wieczoreck, supra,* quoting the above passage from *Southerland,* went on to state that "[t]his intention can be found from the existence of certain indicia or badges of fraud [citation omitted]." The Fifth District Court of Appeal discussed the factors which establish indicia of fraud and noted that the most important ones that the cases have recognized are as follows:

1. insolvency or indebtedness or the transferee;

2. lack of consideration or in some cases grossly inadequate consideration for the conveyance;

3. retention by the debtor of possession of the property; or

4. a relationship between the transferor and the transferee;

5. the reservation of benefit to the transferee;

6. the pendency or threat of litigation;

7. secrecy or concealment; and

8. the transfer of the debtor's entire estate.

*See, Wieczoreck,* at 873–874. As to the necessary requisite proof of fraudulent intent and how the elements or indicia of fraud relate thereto, the Court stated the following:

[w]hile a single badge of fraud standing alone may only generate little more than a suspicious circumstance, insufficient in itself to constitute the requisite fraud to set aside a conveyance, several of them when considered together may afford a basis from which its existence can be properly inferred.

*Id.* at 874, *citing, Banner Construction Corp. v. Arnold,* 128 So.2d 893, 896 (Fla. 1st DCA 1961). In *Southerland,* the Florida Supreme Court further stated that:

[t]he mere fact that a person may be indebted to another does not render a conveyance of his property a fraud in law upon his creditors. The owner of property, whether real or personal, possesses the absolute right to dispose of all or any part of his property as he sees fit. The only restriction imposed by law is that no transfer shall be made *which will interfere with the existing rights of other persons.*

*Ibid.* [citations omitted and emphasis added].

While the case law may present some ambiguous comment about the issue, in both the cases of *In re Mart,* 88 B.R. 436 (Bkrtcy.S.D.Fla.1988) and *Manufacturers Acceptance Corp. v. Caribank,* 86 B.R. 729 (Bkrtcy.S.D.Fla.1988), Judge Thomas C. Britton made it clear that intent to defraud creditors is the ultimate requisite under the statute. In rendering his decision in the *In re Mart* case, *supra,* he wrote the following:

The annuity was established 13 months before bankruptcy. The funding of the annuity cannot, therefore, be avoided as a fraudulent transfer under 11 U.S.C. § 548, which is restricted to transfers within the year preceding bankruptcy.

The asset may be recovered, if at all, only through § 544(b) which invokes State law. The applicable Florida statute, *Fla.Stat.* § 726.01, contains no specific time limitation, but does require proof of *actual fraudulent intent* [emphasis added and footnote omitted]. The facts [here], however, do not support a finding of fraudulent intent....

■ The significance of the above-stated decision is that the law of fraudulent transfers or conveyances under § 726.01 required a showing and proof of the debtor's *actual intent* to hinder, delay, or defraud creditors through the exercise or use of

badges of fraud. The Trustee has failed to plead or prove that CAPITAL BANK was acting fraudulently or that it participated in any fraud.

### b. Identity of Interests and Economic Unit Analysis

In 1984, the United States District Court in the case of *TeleFest, Inc. v. VU–TV, Inc.*, 591 F.Supp. 1368 (D.N.J.1984), was presented with a situation in which it was argued that a payment that was made by a subsidiary on behalf of the parent corporation under circumstances where there was no contractual obligation to make payment, constituted a fraudulent conveyance. This limited view of consideration was not adopted by the United States District Court sitting in New Jersey. In rendering its decision, the District Court relied on an opinion by a Bankruptcy Court in Alabama. The Court in *TeleFest*, recognized and relied on

> the 'identity of interest' rule found in *In Re Royal Crown Bottlers of North Alabama*, 23 B.R. 28 (Bkrtcy.N.D.Ala. 1982). There, the court held that an insolvent debtor receives 'less than a reasonably equivalent value' when it transfers property for a consideration to a third party, but that
>
>> A clear distinction from this rule exists, however, if the debtor and the third party are so related or situated that they share an 'identity of interests', because what benefits one, will in such case, benefit the other to some degree.

*TeleFest, supra*, at 1378, *quoting, In re Royal Crown Bottlers, supra*. The *TeleFest* Court set out the "identity of interest" rule when it wrote:

> '[t]he ultimate question then becomes one of determining the value of this vicarious benefit and testing it by the measure of 'reasonably equivalent' for the property transferred by the insolvent debtor.
>
> When the consideration for a transfer passes to the parent corporation of a debtor/subsidiary making the transfer ... the benefit to the debtor may be

presumed to be nominal, in the absence of proof of a specific benefit to it.'

*Ibid.* The Court in *TeleFest* also went on to state the following as it would apply the rule regarding consideration for payments made by a non-obligor subsidiary on behalf of an obligor parent company. The Court wrote:

> [e]ven more important than good faith in considering whether fair consideration passed is the nature of the transferor's business and its relationship with its parent. It is clear from the 'Credit Department Review' and the Harris memo discussed above that VU–TV was devoted to providing programming for cable television companies.... Monies loaned to VU–TV's parent to purchase a cable television system or for other moves directed toward expansion *would most probably provide an additional and obviously secure market for VU–TV*. The consideration for VU–TV's guarantee of the loans of its parent and sister companies *may not have been a direct benefit, but it was a specific enough benefit for a reasonable trier of fact to conclude that fair consideration inhered in the conveyance.*
>
> In any event, the notion that a benefit accrues to a subsidiary only when there is a direct flow of capital to that entity ... *is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans.* As one commentator has noted
>
>> ... (C)ourts often require a benefit to the guarantor corporation so that the transaction ostensibly fulfills a corporate purpose of the guarantor and is therefore not ultra vires. *The concept of 'benefit' cannot, however, be defined precisely. For example, securing a future sale might constitute a benefit. Consummating a transaction which will improve a corporation's public image might also be said to benefit that company.* Since the concept of benefit involves the potential for such a wide range of results,

courts have often required that the benefit be 'direct'. It is questionable whether this requirement has helped, however, since courts also vary considerably in their interpretation of the term 'direct' [citation omitted].

Where there are indicia of a bona fide financing arrangement, not designed as a shield against other creditors, the lack of perceptible 'direct' benefit to a subsidiary guaranteeing the loan of its parent should not be viewed as tantamount to a lack of 'fair consideration'.... Indirect benefit provides the necessary 'fair consideration'.

Some courts have rationalized upholding various transfers against fraudulent conveyance challenges by finding that sufficient consideration passed to the transferor *because an opportunity had been given to it to escape bankruptcy through the strengthening of an affiliated corporation that received the benefit of the transfer.* Such an approach seems indisputably proper when a weak but still solvent entity is rendered insolvent only because of the inclusion of the guaranty on the liability side of the balance sheet. *This permits the analysis to focus upon economic reality in the appropriate factual context without rewarding legal laxity or inflexibly ignoring real benefits merely because they have no place on the company's balance sheet.*

Such an approach would lead to a finding of fair consideration for a guaranty in a variety of other appropriate contexts. If an alter ego situation presents sufficient consideration, then so should the guaranty of a loan to a third party that is not the alter ego of the guarantor *but whose continued health and existence is vitally important to the guarantor—a vital supplier or customer, for example.* Under this approach, fair consideration to the guarantor could be found without much difficulty when the loan to the affiliated corporation strengthens its operation sufficiently *so that the health of the guarantor is main-*

*tained or improved, even though bankruptcy was not imminent.*

*TeleFest, supra* at 1380, *quoting* Rosenberg, *Intercorporate Guaranties and the Law of Fraudulent Conveyancies: Lender Beware,* 125 U.Pa.L.Rev. 235, 245–246 (1976) [footnotes omitted]. The *TeleFest* Court also noted that:

One commentator on the law affecting 'upstream' guarantees, in which a subsidiary guarantees the repayment of a loan to a parent corporation, and 'cross-stream' guarantees, in which a subsidiary guarantees the repayment by another subsidiary of a common parent corporation ... has opined that:

Because Parent and Subsidiary are part of a single economic unit, it is both logical and desirable that Parent be able to borrow based on the value of its subsidiaries' property and assets and that lenders be able to enjoy the full amount of protection which the borrower can make available. Clear legal treatment of these transactions would enable borrowers and lenders to enjoy commercially required confidence in the effectiveness of their arrangements, but the law relating to upstream guarantees and associated grants of security interests is at present difficult to determine and apply.

*TeleFest, supra,* at 1380, *quoting* Coquillette, *Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation,* 30 Case W.Res. 433, 436–437 (1980) [footnote omitted]. "Coquillette also has concluded that it is desirable for indirect benefits to a subsidiary to suffice as 'fair consideration':"

The existence of fair consideration is therefore more safely determined by what Subsidiary has obtained in the transaction. Some of the funds obtained by Parent may flow through to Subsidiary. In addition, Subsidiary will receive a right to subrogation to the lender's claim against Parent. If Parent has other subsidiaries, Subsidiary may receive cross-guaranties from other subsidiaries and a right of contribution in the event

that it must perform on the guaranty. Subsidiary also receives the intangible benefits of maintaining Parent's financial strength....

*Id., quoting* Coquillette at 452.

Finally, the *TeleFest* Court recited a factual hypothet and then with the use of that hypothet came to the conclusion that the guarantee or payment by a subsidiary of a debt incurred directly by the parent would not be deemed unreasonably equivalent value and, therefore, voidable as a result of a fraudulent conveyance. In so doing, the Court stated:

> The following hypothetical with 'facts' very like those in the instant matter has been posited by yet another commentator in support of the proposition that fair consideration may inhere in a conveyance even though the consideration results only in indirect benefit to the guarantor. A parent corporation, P, which owns two subsidiaries, A and B, asks a bank for a $2 million loan to be used to acquire C, a company that will be integrated into P's manufacturing and marketing system. A and B are required to guarantee the loan to P with equipment, inventory and accounts receivable. Eventually, P, A and B file for reorganization under Chapter XI and then for liquidation.
>
> The 'fair equivalent' received by A and B may also be sought in benefits which they expected to receive from P's acquisition of C, or other benefits resulting from the over-all corporate relationship. For instance, in our hypothetical case it was believed that the acquisition of C was desirable because its product line complemented that of A. Bank could argue that A at least expected to benefit by the affiliation with C. In other fact situations the indirect benefits may be even clearer and more substantial. *The transaction of which the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship between the parent corporation and its subsidiaries,* *rather than the particular transaction giving rise to the guaranty.*

*TeleFest, supra* at 1380–1381, *quoting* Normandin, "Intercorporate Guaranties and Fraudulent Conveyances" in *Personal Property Security Interests Under the Revised UCC* 361, 370–371 (1977).

The Court went on to consider another hypothetical situation in which a holding company owned 50 subsidiaries, each of which operated single retail stores. The Court discussed how all advertising and financial functions were handled centrally and employees all worked under union contracts covering the entire chain. The Court also stated that in this hypothetical fact situation, "[t]he entire operation [was] an integrated one from an economic point of view even if the separate corporate identities of the various subsidiaries [were] carefully preserved, and separate accounting records [were] carefully maintained for each store." *Ibid.* The Court stated that "[b]ecause of economies of scale, the chain [would] be able to obtain goods, services and credit on more favorable terms than would be offered to any of the individual corporations." *Id.* In that situation the Court noted that:

> if the holding company borrow[ed funds] in order to open new stores owned by new subsidiaries, existing subsidiaries which guarantee[d] the parent's obligations may well have received substantial indirect benefits which [would] constitute a fair equivalent consideration, even though the proceeds of the particular loan [are] used to open new stores, and the existing subsidiaries derive[d] no direct benefit from [those] particular transactions.

*Id.*

### 4. CONCLUSION

█ The facts of the instant case clearly preponderate in favor of CAPITAL BANK and evidence that indirect benefits, at a minimum, and, indeed, direct benefits were, in fact, provided to Miami General Hospital, Inc. in exchange for or in consideration of Miami General Hospital, Inc.'s repayment to CAPITAL BANK of the outstanding obligation owed by Recarey Enterpris-

es, Inc. and guaranteed by International Medical Centers, Inc.

A final judgment in favor of CAPITAL BANK will be entered contemporaneous to the entry of this order.

DONE AND ORDERED.