**ENERGEX LIGHTING INDUSTRIES, INC., Plaintiff,**

v.

**NORTH AMERICAN PHILIPS LIGHTING CORPORATION, et al., Defendants.**

**No. 83 Civ. 3929 (CBM).**

United States District Court, S.D. New York.

May 24, 1991.

Robert F. Wood, Dinkes & Morelli, New York City, for plaintiff.

John Vanderstar, Jeffrey Pash, Covington & Burling, Washington, D.C., Lile H. Deinard, White & Case, New York City, for defendants.

MOTLEY, District Judge.

After plaintiff presented its case to this court, defendant moved for a dismissal of the case under Fed R.Civ.P. 41(b). In ruling on a Rule 41(b) motion, it is the duty of this court to "take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive." *Furth v. Inc. Pub. Co.*, 823 F.2d 1178, 1179 (7th Cir.1987) (*quoting Sanders v. General Services Administration*, 707 F.2d 969, 971 (7th Cir.1983)). Fed R.Civ.P. 41(b) directs the court not to make any "inferences in the plaintiff's favor but rather [to] weigh all the evidence and decide where the preponderance lies." *Id. See also Hersch v. United States*, 719 F.2d 873, 876 (6th Cir. 1983) (under Rule 41(b), it is the duty of the court to weigh the evidence and no special inferences in favor of plaintiff should be made); *Bertolino v. Italian Line*, 414 F.Supp. 279, 285 (S.D.N.Y.1976) (same); *White v. Jaegerman*, 391 F.Supp. 438, 439 (S.D.N.Y.1975) (under 41(b) the "court has power to decide the case on the merits and, unlike a jury case, need not consider plaintiff's evidence in a light most favorable to plaintiff"). Furthermore even if plaintiff had made out a prima facie case which would withstand a motion for a directed verdict, this court may still dismiss the case under Rule 41(b). *Huber v. American President Lines*, 240 F.2d 778, 779 (2d Cir. 1957).

For the reasons stated below, defendant's motion is granted.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Fed.R.Civ.P. 52, the court makes the following findings of fact and conclusions of law:

This case involves what plaintiff has called the guaranteed lamp market. This market consists of both fluorescent bulbs and incandescent long life bulbs. (Tr. 922). The incandescent bulbs are long lasting bulbs that burn for a longer period of time than regular incandescent bulbs. Their rated life is a couple of thousand hours. (Tr. 149, 821). These bulbs have a number of unique characteristics such as the construction of their filament and base. (Tr. 148–149, 2225). The fluorescent bulbs sold in this market are exactly the same as any other fluorescent bulb and possess no unique characteristics. (Tr. 151, 822–823, 1114; Stip. 26). They generally have a rated life of approximately 24,000 hours. (Tr. 821).

Both the fluorescent and incandescent bulbs, in the long life market, are sold with a guarantee by the distributor that they will last a specified number of months. (Tr. 84, 151, 922). If they do not last, they are replaced free of charge. (Tr. 148). These guaranteed bulbs sell at a price of four to seven times the price of ordinary bulbs. (Plaintiff's Exh. 115, Tr. 922). Testimony was elicited from Mr. Howell, the president of Energex, which demonstrated that the guarantee on the fluorescent bulbs

had little economic value because the rate at which these bulbs burned out, before the guarantee expired, was under ten percent. (Tr. 1351–1352). Thus it is more efficient to purchase fluorescent bulbs without the guarantee. Dr. Levenson, plaintiff's expert witness, believed that the same also held true for incandescent bulbs. (Tr. 2225). Most guaranteed long life bulbs are sold to industrial establishments such as banks, schools, stores, warehouses and manufacturing plants. (Tr. 150, 914).

During the relevant time period of 1978–1980, there were eight companies that manufactured guaranteed long life lamps. These companies were: Duro Test, Philips, Westinghouse, Sylvania, Energex, Marvel, Solar and Penn Illuminating. Of these, only Duro Test, Philips, Westinghouse and Sylvania manufactured their own fluorescent bulbs for the guaranteed long life market. (Plaintiff's Exh. 512.)

Barriers to entry in to the market are moderate. The machinery needed to produce bulbs is quite expensive, but actually obtaining it is not that difficult because used equipment is available in this Country and new equipment is manufactured overseas. (Tr. 144–145, 846–847, 892–893, 1792–1793). In addition to purchasing the machines, skilled workers must be found to maintain the machines. (Tr. 145, 1793). However, there are no special patents involved in manufacturing long life incandescent light bulbs. As already stated, all fluorescent bulbs are the same, so any manufacturer of fluorescent bulbs could enter the guaranteed long life market. (Tr. 2340–2341). In addition, in 1980, two other firms entered the guaranteed lamp market—Action Tungsram and Angelo Brothers. (Plaintiff's Exhibit 77–IX). Another firm, Supreme, also entered the market after the demise of Energex. (Plaintiff's Exh. 513, Tr. 143, 1792). Thus the entry of these firms shows that the market was not saturated and that manufacturing equipment could be obtained.

Defendant Philips Lighting, a Delaware corporation, is a manufacturer of light bulbs and other lighting products, including long life lamps. (Stip. 7, 8). Guaran-teed Service Lighting Products (GSLP) was a division of Philips that sold guaranteed long life lamps to distributors. (Stip. 13, 14). Through its various divisions, Philips sells to both distributors and directly to end users. Philips manufactured both fluorescent and incandescent bulbs for the guaranteed long life market. (Plaintiff's Exh. 512).

Plaintiff Energex, a New Jersey Corporation, manufactured long-life incandescent bulbs. (Stip. 4). They, however, purchased all of their fluorescent bulbs from Philips. (Stip. 5). Of the incandescent bulbs Energex sold, it purchased a small amount from Philips. (Tr. 1217, 1218, 1221). In this industry, it is necessary for a manufacturer to be able to sell both incandescent and fluorescent bulbs to distributors; otherwise distributors would go to a manufacturer that could meet all of their lighting needs. (Tr. 1183, 1837, 2183). Mr. Howell testified that Philips was the only manufacturer that would supply Energex with fluorescent bulbs. Other manufacturers refused to sell to Energex because Energex did not possess sufficient purchasing power. (Tr. 1103). In 1978, Energex was the largest customer of Philips–GSLP. (Tr. 855). Thus Energex was a competitor of Philips but at the same time depended upon Philips to supply it with fluorescent bulbs. In the same vein, Philips was a competitor of Energex but Energex was a very large customer of GSLP. (Tr. 632). Due to these circumstances, Philips was in a position in which it could "squeeze" Energex by selling Energex fluorescent bulbs for resale at one price and selling the same product directly to companies that were customers of Energex at the same or lower prices. (Tr. 633).

Energex sold its lamps to distributors who then sold them to industrial end users. (Stip. 4). Energex also sold a large number of long life incandescent bulbs to Torch Lighting which used telephone sales to sell directly to the home consumer. (Tr. 1557).

From approximately 1969 to July 1976, Energex was owned and controlled by Salvatore Caravetta. (Tr. 1675–1678). In July 1976, Caravetta sold Energex to Mainte-

nance Engineering (M.E.), a corporation headquartered in Fargo, North Dakota for approximately $650,000. (Plaintiff's Exh. 437, Tr. 1701). M.E. is a distributor of lighting products, including long life bulbs. (Tr. 915). Part of the purchase price was to be paid over time to Caravetta, who reserved the right to retake control of Energex in the event M.E. failed to make the scheduled payments. (Plaintiff's Exh. 437, Tr. 1713–1714).

John Howell served as President of Energex from July 1976 until the business ceased operation in 1980. (Stip. 24). Prior to joining Energex, Howell had been the General Manager of GSLP. (Tr. 77).

Numerous invoices (Plaintiff's Exh. 231, 232, 213, 222, 236, 237, *et al.*) show that, in 1979, Philips offered customers who were distributors substantial discounts on some of its long life lamps. These discounts were in excess of the stated discounts on Philips' published price lists for the quantity of the product being purchased. These invoices show that Philips did not give Energex the same discount that other customers enjoyed. (See e.g. Tr. 316, 318–321, 323, 325–328, 334–335, 337–339, 342, 369, 370–374, 378, 391). As a result, Energex repeatedly paid more for various products purchased from Philips than distributors were paying. (*Id.*)

Furthermore, on a number of occasions, Philips sold products to distributors who were customers of Energex at or below the price at which Energex was selling its products to these same customers. (Tr. 925–926, 1022). In these instances Philips deviated from its published price list in which the discount a customer would receive was related to the quantity of goods purchased. (Plaintiff Exh. 423; Tr. 869–871). There was testimony from one distributor, Mr. Larsen, who was a customer of Energex, that Philips offered him products at prices below or at that being offered by Energex. (Tr. 1022). Mr. Larsen testified that GSLP's general manager, Mr. Ricchiuti, specifically offered to sell him light bulbs at prices below that at which Energex sold the product. (Tr. 1022). He testified that Mr. Richiutti asked him why

he did business with Energex because they were "not going to be around long" and that Philips had the best prices and could take care of him. (Tr. 1023, 1024). Mr. Larsen testified that, based upon these conversations, it was his opinion that Philips was trying to "put[ ] Energex out." (Tr. 1024). Because of the discounts being offered by Philips, Larsen ceased purchasing from Energex. (Tr. 1030).

During 1979, both Energex and M.E. suffered from financial problems. Energex was behind in its payments to Philips and M.E. was unable to make certain of its scheduled payments to Caravetta and informed him of their inability to do so. (Tr. 1705, 1707). In the summer of 1979, Roger Fleck, the credit manager at Philips contacted Mr. Caravetta and requested a meeting to discuss the problems which Energex and M.E. were experiencing. (Tr. 1708). Sometime in July, a meeting was held between Mr. Caravetta, Mr. Howell, Mr. Tumminello and Mr. Fleck. (Tr. 1717). Mr. Tumminello, from 1968–1984, was President of the Lighting Division of North American Philips. (Tr. 560, 612). At this meeting the possibility of Mr. Caravetta taking back Energex was discussed along with possible solutions to Energex's financial problems. (Tr. 1722–1724). Caravetta claims that Tumminello stated that he would "protect" Energex if Caravetta reacquired the company. (Tr. 1723). No agreements, however, were finalized at this meeting. (Tr. 1725).

Following the July meeting, another meeting took place at which, according to Caravetta, Tumminello told him in a private conference that he would put an "umbrella" above Energex and "protect" its line of customers. (Tr. 1728). Caravetta also testified that Tumminello agreed that Energex would receive a five percent greater discount than Philips' other customers. At this meeting all of the participants discussed the manner in which they would deal with Energex's creditors. (Tr. 1730). After a number of telephone calls and letters (Plaintiff's Exh. 518, Tr. 1752), another meeting was held on September 26, 1980. At this meeting the creditors agreed to a

number of proposals for restructuring the debt of Energex and M.E. (Tr. 1757–1760).

Following this meeting, in which Mr. Tumminello did not participate, Mr. Howell, Mr. Caravetta and Mr. Feinberg, Caravetta's attorney, met with Mr. Tumminello in his office. (Tr. 1760–1761, 2056–2057). Caravetta testified that he told Tumminello that a number of agreements were reached concerning creditors but that the deal depended upon Energex receiving a 65% discount, a 5% discount spread and that Philips would not "offer better prices—that he would stick to his published price list." (Tr. 1761). Caravetta testified that Mr. Tumminello promised to honor these agreements. (Tr. 1763). Mr. Feinberg, who was present at the meeting, could not remember any of the specific terms which Caravetta and Tumminello discussed (Tr. 2059) but did remember some discussion of a 5% spread and Philips' agreement to adhere to published discount lists. (Tr. 2060).

Mr. Tumminello, although not remembering details of the particular meetings, did remember agreeing to a 65% discount. (Tr. 676, 680–681). Tumminello, however, testified that if there was any discussion of a 5% discount price differential, he did not give it any significant thought because the 65% discount which he agreed Energex would receive was five points higher than what other customers received. (Tr. 677). Tumminello also testified that there was no discussion regarding a fluctuating spread which would change as other customers' discounts changed. (Tr. 678). Although these agreements were oral, there is a Philips memorandum, in evidence, that documents that Energex was to receive a 65% discount. (Plaintiff's Exh. 107).

Furthermore, Plaintiff's Exhibit 515 is a letter, dated November 1982 from Mr. Feinberg to Philips' attorney. As evidenced by the date, the letter was written over two years after the September–October 1979 meetings took place. In this letter, Mr. Feinberg states that there was an agreement that Energex would receive a 65% discount and a continual 5% greater price discount than that being offered to distributors. It further stated that Mr.

Caravetta's reacquisition of Energex depended upon such an agreement. It also discussed Energex receiving a $250,000 credit line from Philips which both parties agree Philips extended.

In October 1979, as a product of these negotiations, Energex and its creditors signed a number of agreements. These interrelated agreements are fully set forth in writing. (Plaintiff's Exh. 84, 85, 86, 87, 506). The principal document is an agreement among Energex, Caravetta, M.E. and four outside creditors (Philips, GE, Sylvania and Corning) which restructured the relationships among all those parties. The agreement included details about the schedule of payments of Energex's $342,000 in debts to the outside creditors by M.E.; Energex's release of $180,000 of debts owed to it by M.E.; the transfer of Energex's stock by M.E. to Caravetta; and Caravetta's release of all obligations of M.E. (Plaintiff's Exh. 86).

Two separate agreements also exist between Caravetta and M.E. which relate to his reacquisition of Energex stock. (Plaintiff's Exh. 85, 103). Plaintiff's Exhibit 84 sets forth in detail the terms of M.E. and Energex's commercial relationship.

Finally, Energex agreed to give Philips a security interest, subordinate to that of Finance America Capital Corp., in its assets "to secure payment ... of any and all present and future indebtedness" of Energex to Philips. (Plaintiff's Exhibit 87). A UCC filing implementing this security agreement was also executed. (Plaintiff's Exhibit 150).

The security agreement between Philips and Energex specifically provides that "[n]o oral agreement, guarantee, promise, representation or warranty shall be binding." Philips entered into these agreements because Energex was a very large customer of their fluorescent bulbs and had an outstanding debt to Philips. (Tr. 666). Furthermore, Philips received a security interest in Energex's equipment. Philips was specifically a party to the security agreement (Plaintiff Exh. 87) and an agreement which released Energex from certain debts. (Plaintiff Exh. 86). None of

these agreements mentioned any of the oral promises which Caravetta claims were made by Tumminello. Mr. Caravetta claims, however, that he accepted the return of Energex only because of these oral promises. (Tr. 1772).

At about the same time that these written and oral agreements were allegedly entered into, Philips introduced a "Fall Harvest" promotion on one of its incandescent bulbs. This promotion offered specific incandescent bulbs at twenty-three or twenty-four cents. (Defendant's Exh. J–2, Tr. 1225). Energex was offering the same bulbs at thirty-one cents. (Tr. 1226). Philips ran further promotions in the Spring of 1980. (Defendants Exh. J–1, 5). Although, Mr. Howell testified that Mr. Tumminello did not mention the promotions in their negotiations, Mr. Howell also testified that he and Caravetta became aware of the "Fall Harvest" promotion before the written agreements were signed. (Tr. 1075–1077). He testified that these promotions had devastating effects on Energex. (Tr. 1078).

Although, Mr. Howell stated that he believed that these promotions were run in order to drive Energex out of business (Tr. 1226), Philips' internal documents show that these promotions were directed at Marvel, another manufacturer of guaranteed lamps, rather than Energex. Plaintiff's Exhibit 76–VI shows that Philips was concerned with Marvel's liberal use of discounts in selling their product and Philips responded with the promotions described above. (Tr. 1237–1283).

After October, 1979, Energex claims that the use of these promotions violated the promised 5% discount differential and that the promotions deviated from Philips' published price list also in violation of the agreement. (Tr. 1606–1607). Plaintiff points to Defendants' Exhibit J–2 and J–5 as evidence of the above practices. Defendant's Exhibit J–2, as discussed above, was Philips' promotion on an incandescent bulb called an A19. This promotion ran from October 15, 1979 to December 14, 1979. The A19 was not a product that plaintiff often bought from defendant for resale but rather was the principal product manufactured by Energex. (Tr. 434–35, 2381).

From March 3, 1980 to May 2, 1980, Philips ran a promotion on fluorescent bulbs. (Defendant's Exh. J–5). Under this promotion any customer who bought twelve cases of fluorescent bulbs would then receive an additional case free. As plaintiff demonstrated, it appears that when this free case is translated into a dollar value, any order in excess of 31 cases may have increased the customers discount to more than 65%. (Plaintiff's Exh. 524). The promotion also appears to be a violation of Philips' promise not to deviate from its published price list. Furthermore, Philips did not allow Energex to partake in these promotions because Energex was a manufacturer with a special manufacturer's discount and not a distributor. (Tr. 1079)

Mr. Howell testified that these were the first promotions run in the guaranteed lighting market. (Tr. 1077). Although, there is no evidence of any promotion run by GSLP prior to the "Fall Harvest" promotion, Mr. Tumminello testified that such promotions were run all the time. (Tr. 686–687).

Energex also pointed out that customers of Philips at considerable distances did not pay their own freight costs. Thus it cost Philips more to supply such customers than it cost Philips to supply Energex which was located a short distance away from Philips. Energex claims that this information shows that Philips was offering better prices to customers other than Energex. However, testimony clearly demonstrated that it was industry practice for the manufacturer to pay freight cost. (Tr. 329). Indeed, it was Mr. Howell, himself, during his tenure at GSLP, who first initiated this practice. (Tr. 1380–1382).

In July, 1980, Energex went out of business. (Stip. 3). Energex claims that its demise was due to Philips' predatory pricing practices.

Shortly after Energex ceased doing business in 1980, Philips acquired Solar Electric. (Tr. 2434). In 1983, Philips acquired the lamp division of Westinghouse. (Stip.

15). The Westinghouse acquisition was allowed to take place only after the Justice Department had investigated the possibility that such an acquisition would violate the antitrust laws. (Tr. 844–845).

In 1983, Energex filed suit in this court claiming violation of the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13 *et seq.* and §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.* Plaintiff claims that Philips' activities constituted predatory pricing. Plaintiff also seeks damages for breach of contract, fraud, and tortious interference. Both parties agree that New Jersey law applies to the state law claims because all of the pertinent acts occurred in that state.

This action was originally before Judge Shirley Wohl Kram. On March 12, 1987, Judge Kram entered summary judgement in favor of defendant on plaintiff's claim under the Robinson–Patman Price Discrimination Act and the "conspiracy to monopolize" claim. Plaintiff then withdrew its claim under § 1 of the Sherman Act. (Restraint of Trade). A bench trial began on April 2, 1991 and on April 29, 1991, Energex rested its case. At that time, oral argument was heard regarding the present motion and the trial was adjourned in order to allow plaintiff to respond in writing to defendant's motion.

## I. THE ANTITRUST CLAIMS

### A. Monopolization

Plaintiff claims that defendant both monopolized the market in guaranteed long life lamps and attempted to monopolize this same market. Both claims are under § 2 of the Sherman Act. "The offense of monopoly under § 2 of the Sherman Act has two elements (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development of a business as a consequence of a superior product, business acumen or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966); *Delaware & Hudson Ry. v. Consol-*idated Rail Corp., 902 F.2d 174, 178 (2d Cir.1990).

■ Before adjudicating whether a defendant possesses monopoly power, a court must determine the scope of the relevant market. For the purpose of this motion, the court accepts, but does not find, that the relevant product market is the guaranteed lamp market. In order to prevail on the antitrust claims, plaintiff must show that defendant possessed sufficient market power to control prices or unreasonably restrict competition. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389, 76 S.Ct. 994, 1003, 100 L.Ed. 1264 (1956).

■ The strongest evidence of market power is the market share which defendant possesses of the relevant market. *See Delaware & Hudson*, 902 F.2d at 179. In numerous cases, the Second Circuit has found that a low market share precludes a finding of monopoly power. *See e.g., Barr Laboratories, Inc. v. Abbott Laboratories,* 867 F.2d 743, 742 (2d Cir.1989) (31% of national market does not constitute sufficient market power for antitrust violation); *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir.1945) (33% of relevant market is "certainly" not a monopoly).

■ In addition to market share, however, "the trend and guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence." *Broadway Delivery Corp. v. United Parcel Service, Inc.*, 651 F.2d 122, 127–30 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Other factors that a court must consider are the strength of the competition, the probable development of the industry, entry barriers and consumer demand. *Hayden Pub. Co. v. Cox Broadcasting*, 730 F.2d 64, 69 (2d Cir. 1984) (*citing United States v. Columbia Steel Co.*, 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948)). Thus "[w]hen the existence of significant market power is an essential element of a claim for treble damages, the plaintiff's market power evi-

dence, whether consisting of the defendant's market share or of specific conduct indicating the defendant's power to control prices or exclude competition must be substantial." *Broadway,* 651 F.2d at 130.

■ Plaintiff in this case has simply failed to produce any credible evidence which would indicate that Philips has either a sufficient market share or the ability to control prices. Specifically, plaintiff relies upon two exhibits to establish Philips' market share. Exhibit 112B is a chart compiled by Howell in preparation for the lawsuit which states the market share that each manufacturer of guaranteed long life lamps possessed. (Tr. 1171–1172). Some of the figures represented on the chart were derived from Howell's conversation with people connected to the various manufacturers and distributors represented on the chart. Other figures were based upon his own experience. (Tr. 1178, 1597–1598, 1605). In some cases, Howell received conflicting information as to the sales of a particular company and then gave different weight to the various opinions depending upon his knowledge of the individual from whom such information came. (Tr. 1598–1599, 1602).

The chart indicates that Philips possessed 29.5% of the market in 1979 and 61.8% of the market at year-end in 1980. Other columns show that, if Verd-a-Ray and Lustra—Philips' two in-house distributors who sold Philips bulbs to the actual consumer—are included, Philips' market share is 23.3% for 1979 and 70.7% for 1980. (Tr. 71, 1533, Plaintiff Exh. 112B). In his calculations, however, Howell did not take into account the sales of guaranteed lamps by a company called Duro Test. (Tr. 1533–1534).

Duro Test is the largest and oldest manufacturer of long life lamps. (Tr. 1681–1682, 1684, 2357–2358). There was testimony that in the relevant time frame it had sales of approximately $50–$60 million a year. (Tr. 825–826, 1535). Howell chose not to include Duro Test because the company manufactures fluorescent and incandescent light bulbs and then sells them directly to the final end user. (Tr. 195, 824, 1533–1534). In contrast, Philips–GSLP and Energex sell their lamps to distributors who then sell them to end users. Thus there was repeated testimony that Duro Test and Philips were not competitors because they did not compete for the business of distributors. (Tr. 1025, 1028, 2304).

■ Whereas it may be true that these companies did not directly compete with one another, in determining the actual market share that Philips possessed of the guaranteed long life market, it is crucial that all of the participants be included. After all, these companies do compete in the market place when the consumer chooses to buy a bulb manufactured by Philips, Energex or Duro Test, whether or not the consumer purchases the bulb through a distributor or directly from the company. (Tr. 769, 1534–1535). There was testimony that, if Duro Test had been included in Howell's chart, Duro Test's market share would have been about 30% and Philips' about 30% (Tr. 1541).[1] This, of course, assumes that the other figures represented on the chart are accurate. It is clear to this court that the prices, output and sales practices of the largest manufacturer of the product, in this case Duro Test, plainly have a large impact on every other manufacturer and seller in the industry. (Tr. 1534–1535, 2305). The ultimate price that the consumer pays for the product would be substantially influenced by the presence of Duro Test. (Tr. 1537).

In determining market share, the entire relevant market must be assessed and whether or not a product goes through a middleman cannot be a determining factor. Therefore, the entire relevant market— guaranteed lamps—must be analyzed to determine market share. The court simply cannot accept Plaintiff's Exhibit 112B as an

---

1. If one accepts the percentage calculation that includes Verd-a-Ray and Lustra then the distortion of the market by the exclusion of Duro Test is even more obvious. Verd-a-Ray and Lustra essentially performed the same function that Duro Test did—namely selling the manufacturers product through in-house distributors.

accurate representation of the share of the market that Philips possessed.

Plaintiff also relies upon Plaintiff's Exhibit 505. Regarding this exhibit, plaintiff's attorney stated that this was the only documentary evidence of Philips' market share and, although hearsay, this court admitted it pursuant to Fed.R.Evid. 804(b)(5) as more probative on the point for which it was offered than any other evidence which the proponent could procure. (Tr. 765–766).

■ This exhibit is a letter dated November 6, 1981 from N.V. Philips, a company in Holland. It was written after a number of officers from N.V. Philips visited Philips in the United States. The letter states that Philips "has 65% of the market in this segment." (Tr. 1623). The letter, however, states that it does not include Duro Test. Furthermore, this figure refers to Philips' market share after its acquisition of Solar which occurred after Energex ceased operations. (Tr. 769–770). Mr. Tumminello unequivocally denied that Philips possessed 65% of the market during this time period. (Tr. 770, 779). The 65% figure that this letter contains simply does not address Philips' market share during the relevant time period which would be before July, 1980 and the demise of Energex. If other credible evidence had been presented, this figure may have gone to Philips' ultimate growth in the market and their intent to monopolize such a market but, as plaintiff's best documentary evidence on the matter, it simply does not do the whole job. Thus, once again, this court is left with no figure that would provide an accurate description of the market share which Philips possessed before Energex went out of business and Philips obtained Solar.

During its case, plaintiff presented the testimony of Dr. Levenson, an economist qualified to give expert testimony. Although Dr. Levenson had made numerous calculations regarding the valuation of Energex and the relevant product market, he presented no analysis of the market share that Philips possessed. Rather, he exclusively relied upon the 65% figure from Exhibit 505. (Tr. 2179). This court finds it quite surprising that this expert did not complete an independent analysis of the evidence regarding market share.

Therefore, all this court has to go on to establish the extremely important factor of market share are the computations of Mr. Howell, which the court rejects as wrongly computed, and a letter that states Philips' market share almost two years after Energex went out of business. Plaintiff has simply failed to present credible evidence which would convince this court that Philips had a share of the market sufficiently substantial to constitute monopoly power.

■ As stated above, this court must examine a number of other factors as well as market share to determine defendant's market power. As previously stated, however, the entry barriers in this industry are not excessively high, nor has plaintiff presented any evidence to show that Philips had the ability to set prices in the industry. In fact, the evidence demonstrates that there was quite a bit of competition from Marvel. All Energex has demonstrated is that Philips had the ability to sell its products at less expensive prices than Energex was able to do. Furthermore, it would appear that Duro Test had the ability, at any time, to decide to sell to distributors rather than consumers, if Philips began to charge monopoly prices. Thus there is no evidence that followed from these facts that Philips had the ability to set unreasonable prices or control the market—only that Energex could not compete.

Energex has failed to jump the hurdle which every plaintiff in a monopoly case must master: it has failed to present evidence that would demonstrate that Philips had significant market power. It is possible that Philips did possess this power; plaintiff, however, has not presented sufficient evidence to meet its burden.

### B. Attempted Monopolization

■ The same analysis applies to plaintiff's claim of attempted monopolization. A defendant is guilty of attempted monopolization if there exists a dangerous probability of success in monopolizing a given

product market. *Nifty Foods Corp. v. Great Atlantic and Pacific Tea Co.*, 614 F.2d 832, 840 (2d Cir.1980). As the Second Circuit has stated: "A threshold showing for a successful monopolization claim is sufficient market share by the defendant.... We have held that a 33% market share does not even approach the level required for a dangerous probability of success.... [However,] market share is the primary indicator of success ... not the sole one." *Twin Laboratories v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir.1990).

■ As stated above, plaintiff has simply failed to produce sufficient evidence that defendant possessed a substantial share of the market, even looking at other factors such as entry barriers and the general level of competition in the market, plaintiff has failed to sustain its case.

### C. Predatory Pricing

Furthermore, even if Energex had jumped the hurdle of showing monopoly power, which it did not, it failed to present evidence on the claim that Philips had engaged in predatory pricing. Predation is "the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the loses through higher profits earned in the absence of competition." *Northeastern Tel. Co. v. Am. Tel. and Tel. Co.*, 651 F.2d 76, 87 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (*quoting* 3 P. Areeda & D. Turner, Antitrust Law ¶ 711b, at 151 (1978)).

■ The most widely accepted analysis for detecting the occurrence of predatory pricing is the Areeda–Turner analysis. Under this analysis, a defendant is considered to be engaging in predatory pricing if it adopts policies which earn below average variable cost. *See* Areeda and Turner, *Predatory Pricing and Related Practices*

*Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975).[2] Furthermore, the Supreme Court has recently ruled in the context of a § 1 Sherman Act violation that an antitrust injury requirement cannot be satisfied by a showing that the long term effect of a pricing policy would be to eliminate retailers and ultimately reduce competition. The Court stated that "[r]ivals cannot be excluded in the long run by a nonpredatory ... price scheme unless they are relatively inefficient." They went on to say that "[e]ven if that were false ... a firm cannot claim antitrust injury from nonpredatory price competition on the asserted ground that it is 'ruinous'." *Atlantic Richfield Co. v. USA Petroleum Co.*, — U.S. ——, 110 S.Ct. 1884, 1891 n. 7, 109 L.Ed.2d 333 (1990). This appears to be precisely what plaintiff is claiming.

■ Plaintiff has failed to produce any evidence whatsoever to demonstrate that Philips was not earning a profit on the discounted prices it gave to certain customers. Under any predatory pricing analysis this must be an essential part of plaintiff's case. In *Atlantic*, the Supreme Court stated that "when a firm ... lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation." *Id.* Although the practices in which Philips allegedly engaged, of either "squeezing" Energex in its purchases of fluorescent bulbs or undercutting Energex's prices in regard to incandescent bulbs, may not be considered polite, such practices do not establish the activity of predatory pricing. "Antitrust law ... does not require one competitor to give another a break just because failing to do so offends notions of fair play." *Twin Laboratories v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990).

**2.** In Judge Kram's opinion of March 12, 1987, she ruled that the Areeda–Turner presumptions should not apply in this case because the defendant was both a competitor of Energex and supplied Energex with fluorescent bulbs. Plaintiffs, however, in their pretrial papers have failed to provide an alternative analysis. In light of the Supreme Court's ruling in *Atlantic* and previous development of the law of predatory pricing, some analysis of whether the price defendant is charging is profit making is essential. Even if a strict Areeda–Turner analysis is not applied, plaintiff has failed to substantiate its claim.

Plaintiff has asserted that, although it has presented no evidence that Philips was not making a profit on either its incandescent or fluorescent bulbs, it has presented evidence that Philips "squeezed" it by selling fluorescent bulbs to distributors at one price and to Energex at another price, and that such action constitutes predatory pricing. (Tr. 2548–2549). "Such price squeezes [however] rarely have independent competitive significance apart from the consequences of vertical integration itself.... not all price squeezes are invidious." P. Areeda & D. Turner, *Antitrust Law Vol.* III, ¶ 728 at 231. The occurrence of the squeeze in this case resulted from Philips being a more efficient company in that it was able to sell its fluorescent bulbs directly to the distributor after manufacturing them. Energex, on the other hand, had to buy its fluorescent bulbs from Philips and then sell them to the distributor. As Areeda and Turner point out, when an efficiency squeeze occurs "there is no good reason to protect independent fabricators from lower cost competition. [Even though], the independents might withdraw from the business unless they achieve similar economies." *Id.* at 233.

Plaintiff has failed to produce sufficient evidence on the claim that defendant has engaged in predatory pricing and as such this claim must be dismissed.

## II. STATE LAW CLAIMS

### A. The Contract Claim

As previously stated, the state law claims are governed by New Jersey law. Plaintiff claims that defendant has breached an oral agreement between Caravetta and Tumminello, acting as Philips' agent, pursuant to which Philips agreed to provide plaintiff with a 65% discount, maintain its published price list, give Energex a 5% greater discount rate than that provided to distributors and, in general, not try to take away Energex's customers. At present, it is not precisely clear the extent of these

promises or of what these promises consisted.

These oral agreements occurred during the same time frame as the written agreements which accomplished a general restructuring of the debt of Energex when Energex was reacquired by Caravetta from Maintenance Engineering. These negotiations culminated in a series of written agreements executed on or about October 16, 1979.[3] None of these agreements includes any reference to the oral contract that Energex now seeks to enforce. Indeed, the security agreement between Energex and Philips states that "no oral agreement, guarantee, promise or warranty shall be binding." (Plaintiff's Exh. 87, Tr. 1414).

Defendant argues that the parol evidence rule bars consideration of the oral agreement. The parole evidence rule "precludes, *as a matter of substantive law*, the introduction of evidence, antecedent negotiations or agreements to alter a subsequent writing, on the theory that such antecedent matters were integrated in the written agreement." *Emerson New York—New Jersey Inc. v. Brookwood Television*, 122 N.J.Super. 288, 300 A.2d 187, 189 (1973). *See also Restatement (Second) of Contracts* § 209(3) (a "completely integrated agreement supersedes even consistent additional terms").

Parol evidence may be used, however, to show that false representations were made when the contract was executed. *Kero v. Terminal Construction Corp.*, 6 N.J. 361, 78 A.2d 814 (1951) (parol evidence admissible where defendant agreed to fill in certain terms in contract but did not do so). Such an exception is limited, though, to those instances where one party seeks to disaffirm the contract rather than alter or change the agreement. *May v. Shohan*, 131 N.J.L. 321, 36 A.2d 409 (1944); *See also Emerson*, 300 A.2d at 189 (parole evidence "does not preclude evidence that would tend to subvert or overthrow the writing entirely").

---

**3.** The exact date of the signing of these contracts is uncertain, although they are dated October 16, 1979.

■ Plaintiff in this case claims that the statements made by Mr. Tumminello fraudulently induced him to accept the return of Energex. Plaintiff, however, is not trying to overthrow the contract but rather to enforce a combination of the written contract and the oral agreement. Thus plaintiff does not fall into the fraud exception to the parol evidence rule.

■ Under New Jersey law, parol evidence may also be used to show the existence of a collateral oral agreement which is on a subject distinct from that of the written agreement. *See Shinn v. Black*, 97 N.J.L. 219, 117 A. 142, 143 (A. & E. 1922); *Mcenaney v. Spedick*, 13 N.J.Super. 37, 80 A.2d 237 (App.Div.1951). To justify the admission of a parol evidence promise by one of the contracting parties to a written agreement, on the ground that the promise was collateral, the promise must not be only collateral but must relate to a subject distinct from that to which the written contract applies. *Id.*, 80 A.2d at 238–239. (*citing Naumberg v. Young*, 44 N.J.Law 331 (Sup.Ct.1882)). The court provides the following illustration: When there is a written contract of sale, an oral warranty will not be considered collateral. *Id.*

■ This court finds that the oral agreements between Philips and Energex were collateral to the written agreements. Although both had the purpose of providing a financial environment conducive to the continued viability of Energex, they are unrelated agreements. The written agreements go only to the restructuring of Energex's debt and do not encompass any special terms which Philips would provide to Energex after the company was reacquired. The writings are wholly unrelated to the relationship between Energex as a customer of Philips. The oral agreements discuss only the discounts that Energex would receive and the pricing policies of Philips and are unconnected to the restructuring of Energex's debt. Therefore, this court finds that parol evidence may be admitted to show the existence of these collateral oral agreements.

■ Plaintiff states that the oral agreement allegedly consisted of three terms: (1) Energex would receive a 65% discount; (2) Energex's discount would remain 5% greater than that being offered to other distributors; (3) Philips would adhere to its published price list. As to promise number one, there is no dispute that Energex received a 65% discount. (Tr. 1417, 2522). As to agreement number two, that Philips would adhere to its published price list, defendant argues that such an agreement is illegal as a violation of § 1 of the Sherman Act.

This court agrees that Philips' oral contract with Energex, assuming that there was such a contract, is an illegal agreement. "Section 1 of the Sherman Act provides in pertinent part: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems Inc.*, 879 F.2d 1005, 1012 n. 4 (2d Cir.1989) (*quoting* 15 U.S.C. § 1 (1982)). "[I]n *Sugar Institute v. United States*, 297 U.S. 553, 601–02 [56 S.Ct. 629, 643, 80 L.Ed. 859] (1936), the Court held unlawful an agreement to adhere to previously announced prices and terms of sale, even though advance price announcements are perfectly lawful and even though the particular prices and terms were not themselves fixed by private agreement." *Catalano Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980). In *Catalano*, the Court specifically stated that an agreement to eliminate discounts would be per se illegal. *Id.* at 648, 100 S.Ct. at 1928.

An agreement that a published price list will be adhered to is a violation of the Sherman Act because it interferes with the setting of prices by free market forces. *United States v. Container Corp. of America*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969). Clearly, the agreement between Philips and Energex that Philips would adhere to its published discount list interferes with prices, throughout the industry, being dictated by the competitive laws of the market. Al-

though the agreement, itself, was only between Philips and Energex, and not between an entire industry as was the case in *Sugar Institute* and *Catalano*, the effect of Philips giving published discounts to all of its customers would have been felt throughout the market. *See also United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940). ("a conspiracy to fix prices violates § 1 of the Act though ... it is not established that the conspirators had the means available for accomplishment of their objective."); Sullivan *Antitrust* 192 (1977) ("It now is settled that in price fixing cases no question whatsoever is to be asked about the defendants' [market] power if their purpose is to fix prices or if their conduct, should it achieve its goal, will be to affect market price.")

The agreement between Energex and Philips would have tended to drive prices up because Philips ostensibly promised that regardless of market conditions it would not increase its discount. Thus Philips' competitors such as Marvel could cease worrying about price competition from Philips and would cease trying to undercut Philips' prices. Furthermore, as the contract was clearly intended to do, it would put an end to the stiff competition which had previously existed between Energex and Philips. The clear effect of such an agreement would be to stabilize prices in the market. An agreement such as this one which would prevent market forces such as supply and demand from dictating prevailing prices is precisely the type of situation which the Sherman Act was meant to address.

This agreement is in violation of the Sherman Act and this court will not enforce it. "It is a rule of general application that any bargain is illegal if its formation or performance is prohibited by statute, and it will not be enforced in the courts." *Naseef v. Cord, Inc.*, 90 N.J.Super. 135, 216 A.2d 413, 417 (1966), *aff'd on other grounds*, 48 N.J. 317, 225 A.2d 343 (1966) (*citing Samuel D. Wasserman v. Klahre*, 24 N.J.Super. 143, 148, 93 A.2d 628 (App. Div.1952)). *See also Croce v. Ports*, 228 N.J.Super. 581, 550 A.2d 533, 535 (1988) ("The court will not come to the aid of parties asserting claims arising from an illegal transaction but will leave them where it finds them"). *Coldwell Baker Com. Real Estate Serv. v. Wilson*, 700 F.Supp. 1340, 1347 (D.N.J.1988) ("a contract formed in violation of a statute is void as against public policy"). *See also Continental Wall Paper Co. v. Louis Voight & Sons*, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909) (agreement in violation of Sherman Act will not be enforced).[4]

Although the agreement between Energex and Philips regarding Philips maintaining its published price list cannot be enforced due to its illegality, that does not necessarily mean that the clause regarding a 5% discount differential cannot be enforced. The question is whether the illegal clause can be severed from the remainder of the oral agreement.

"[I]f a contract contains an illegal provision, [and] if such a provision is severable the courts will enforce the remainder of the contract after excising the illegal portion." *Naseef*, 216 A.2d at 418. "A bargain that is illegal only because of a promise or provision for a condition, disregard of which will not defeat the primary purpose of the bargain, can be enforced with the omission of the illegal portion by a party to a bargain who is not guilty of serious moral turpitude unless this result is prohibited by statute. Recovery is more readily allowed where there has been part perform-

---

**4.** Although, this court will not enforce Phillips' agreement to adhere to its published price list on the ground that it is illegal, the court finds it highly unlikely that such an agreement ever existed. Mr. Caravetta, himself, testified that he told Mr. Tumminello that "I am not going to tie you to anything. I understand you may have to float your line of discounts up and down. All I want to make sure is that we have a clear understanding that we float up and down with the same 5 percent differential from your top discount that you give to the level 2 distributors." (Tr. 1728–1729). Thus Mr. Caravetta's own testimony demonstrates that any agreement was principally concerned with the 5% differential. In fact it would be illogical to have an agreement that combined both a contract to adhere to published prices and an agreement that Energex's discount would fluctuate if prices changed.

ance of the legal portion of the bargain." *Jones v. Gabrielan,* 52 N.J.Super. 563, 146 A.2d 495, 499 (1958) (*quoting Restatement of Contracts* § 603 at 1119). The *Jones* court went on to state that: "Professor Corbin suggests that questions of 'divisibility' have been decided in the final analysis on the basis of a 'judicial instinct for justice' rather than by invoking general rules governing the separability of tainted provisions." *Id.* (citing 6 Corbin *Contracts,* 1520 at 1004 (1951)).

Some guidance may also be adduced from examining a number of Supreme Court opinions. The Supreme Court has been hesitant to entertain a defendant's defense that a contract has violated the antitrust laws in order to prevent "people from getting other people's property for nothing when they purport to be buying it." *Kelly v. Kosuga,* 358 U.S. 516, 520–521, 79 S.Ct. 429, 431–432, 3 L.Ed.2d 475 (1959) (*quoting Continental Wall Paper Co. v. Louis Voight & Sons,* 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (dissenting opinion)). However, the Court also stated that an unlawful agreement under the Sherman Act, itself, could not be enforced. *Id.* In other words, the Court seemed to insinuate that that part of a contract that did not directly violate the Sherman Act is enforceable. *Id.,* 358 U.S. at 521, 79 S.Ct. at 432 ("And while analysis in terms of 'divisibility' or some other verbal formula may well be circular ... In any event, where, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement.").

 This court will allow the defense of the Sherman Act as to the agreement that Philips would abide by the published price list. For this court to enforce it, would be to enforce a direct illegality. *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 82, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982). In this sense, the case is unlike

*Kelly* [5] in which, if the contract was not enforced, the defendant would have had the benefit of products for which it had not paid. No such consideration is involved in this case. On the other hand, the 5% discount differential is not in violation of the Sherman Act and is unconnected to the illegal portion of the agreement.

 The court finds, however, that it cannot enforce this part of the agreement because it is too indefinite. The rule in New Jersey is that where the terms of the contract are so indefinite that a party's obligations cannot be determined, a court will not attempt to enforce the contract. In *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l. Bank,* 163 N.J.Super. 463, 395 A.2d 222, 227 (A.D. 1978), *cert. denied,* 79 N.J. 488, 401 A.2d 243 (1979), the court held:

> an agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one. *Friedman v. Tappan Development Corp.,* 22 N.J. 523, 531, 126 A.2d 646 (1956). A contract so vague in description of the performance of each party thereto is incapable of remedy at law or equity. *Caullett v. Stanley Stilwell & Sons, Inc.,* 67 N.J.Super. 111, 115, 170 A.2d 52 (App.Div.1961). An essential characteristic of an enforeable contract is that its obligations be specifically described in order to enable a court or trier of fact to ascertain what it was the promisor undertook to do. Williston. *Contracts* (Jaeger, 2ed 1957) § 24. See also *Heim v. Shore,* 56 N.J.Super. 62, 73, 151 A.2d 556 (App.Div.1959); *Montclair Distributing Co. v. Arnold Bakers, Inc.,* 1 N.J.Super. 568, 575, 62 A.2d 491 (Ch.Div. 1948).

*Id. See also Borough of West Caldwell v. Borough of Caldwell,* 26 N.J. 9, 138 A.2d 402, 410 (1958) ("To be enforceable as a contractual undertaking, an agreement must be sufficiently definite in its terms that the performance to be rendered by

---

**5.** Furthermore in the *Kelly* case, the contract, itself, did not violate the Sherman Act. It was

the reason that the contract was entered into in the first place that violated the Sherman Act.

each party can be ascertained with reasonable certainty."). The agreement regarding the 5% discount differential is simply too ambiguous for this court to enforce. First, Tumminello testified that the 5% discount was never meant to be a fluctuating discount and that he assumed that the 65% discount which Energex received fulfilled any obligation on the part of Philips. (Tr. 677–678). Portions of Mr. Caravetta's testimony confirms this as well. (Tr. 1917, 1923–1925). Thus the very meaning of the 5% discount is left in doubt. Second, it appears that there was no finite period of time for which this agreement was to be in effect. (Tr. 2573–2574). Third, and even more importantly, there was no testimony as to any discussion of whether this discount was to be limited to Energex's flourescent purchases or whether it was to go to Energex's incandescent purchases from Philips as well. (Tr. 2574–2575). Fourth, there seems to have been no discussion in formulating the agreement as to whether the 5% discount was to apply to special promotions run by Philips or whether the 5% differential only pertained to Philip's written price lists. (Tr. 2575–2576). This court cannot enforce the agreement because the above terms are simply too vague and would call for nothing but conjecture and unwarranted inferences by this court.

### B. Tortious Interference

■ Energex next claims that Philips tortiously interfered with its business by targeting customers of Energex and offering them lower prices on lamps than Energex could offer. Plaintiff principally relies upon four sources of evidence to support this claim. First, there are numerous invoices which clearly show that Philips offered customers other than Energex products at discounts greater than that which Energex received. Second, that the sales promotions which Philips ran further served to take customers away from Energex. Third, plaintiff relies upon Plaintiff's Exhibit 76 which was part of Philips' Sales Plan. This exhibit indicates that Philips intended to try to sell products to customers of both Energex and Marvel. Fourth,

plaintiff heavily relies upon the testimony of Mr. Larsen who, as previously discussed, testified that Ricchiuti told him that he would supply Larsen with bulbs at a lower cost than he could purchase them from Energex and that Energex would not be around for long. (Tr. 1022–1024). At the outset, it must be stated that Energex cannot claim tortious interference with a contract. There was no evidence at trial that Energex had a requirements contract or any other contract establishing a permanent relationship with any of their customers. Thus this is an action for tortious interference with a business relationship, not with a contract.

■ "An action for tortious interference with a business relation protects the right 'to pursue one's business, calling or occupation free from undue influence or molestation.' What is actionable is the 'luring away, by devious, improper and unrighteous means, of the customer of another.'" *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 563 A.2d 31, 36 (1989) (*quoting Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 586, 175 A. 62 (E. & A. 1943)). In order for defendant's actions to be devious or improper they must have "transgresse[d] ... generally accepted standards of common morality or of law. In other words, was the interference by defendant sanctioned by the 'rules of the game.' There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances." *Id.*, 563 A.2d at 40. (citations omitted). *See also Snyder v. BMW of North America*, 233 N.J.Super. 65, 558 A.2d 28 (1989) (same); *Sustick v. Slatina*, 48 N.J.Super. 134, 137 A.2d 54 (1957) (same).

The conduct of which Energex complains, although not nice, does not transgress the "rules of the game." All of plaintiff's evidence points to Philips having an aggressive sales policy. Such conduct does not establish the elements necessary to comprise a tortious act. Indeed, stiff competition and price-cutting go on everyday in the business world. Philips may have been meanspirited, but it did not

transgress the law. "When a plaintiff's loss of business is a mere 'incident of competition,' it is a 'damnum absque injuria, unless some superior right by contract or otherwise is interfered with.'" *Printing Mart–Morristown*, 563 A.2d at 41. (*citing Sustick*, 48 N.J.Super. at 143, 137 A.2d 54). *See also, Raul Intern. Corp. v. Sealed Power Corp.*, 586 F.Supp. 349, 358 (D.N.J. 1984) (there is no claim for tortious interference when defendant outmaneuvered plaintiff in the marketplace). Plaintiff's claim for tortious interference must be dismissed.

### FRAUD

Plaintiff claims that Tumminello fraudulently induced Caravetta to reacquire Energex's stock. Plaintiff claims that such inducement consisted of the three part oral promise to provide Energex with a 65% discount, a 5% spread and the promise to adhere to Philip's published price list.

■ Both parties agree that in order to succeed on its claim, plaintiff must show that Tumminello did not intend to honor these promises at the time when he allegedly made them. This court must be careful to distinguish between actions for fraud and actions for breach of contract. Thus a fraud claim cannot be predicated on the allegation that a promise to be performed in the future was unfulfilled. Rather, the promisor had to possess the intent not to fulfill the promise at the time such promise was made. *See Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J.Super. 452, 489 A.2d 1209, 1211 (A.D.1985) (*citing, Kuhn v. Seaton*, 187 Kan. 106, 353 P.2d 959, 961 (1960)) ("promise to pay in future is fraudulent if there is no present intent ever to do so"). Both plaintiff and defendant rely upon the *Capano* case which states that:

> an action for misrepresentation cannot [ordinarily] be predicated upon matters *in futuro. Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J.Super. 369, 380, 164 A.2d 607 (A.D.1960). However, a false representation of an existing intention, i.e., a "false state of mind," with respect to a future event or action has

been held to constitute actionable misrepresentation. *Samatula v. Piechota*, 142 N.J.Eq. 320, 323, 60 A.2d 86 (Ch.1948). In other words, the defendant must have no intention at the time he makes the statement of fulfilling the promise. Defendant's lack of intention may be shown circumstantially by his subsequent acts and by subsequent events ..."

*Capano v. Borough of Stone Harbor*, 530 F.Supp. 1254, 1264 (D.N.J.1982). Thus it is clear that in order for plaintiff to sustain its burden, it must show that Tumminello did not intend to abide by the agreements when they were made.

■ Mr. Caravetta testified, in fact, that he believed Mr. Tumminello when the latter made certain promises and that he further believed that Mr. Tumminello intended at the time to honor any inducements he offered in July and September, 1979. (Tr. 1917, 1991–1992). According to Caravetta's testimony, it was not until March 1980, when Energex decided to acquire Solar, that Tumminello *changed his mind* and decided not to honor the promises he had made. (Tr. 1992). Howell confirmed this view, testifying that Philips did not intend to put Energex out of business as of October 16, 1979, but instead formed that intent some time later. (Tr. 1511–12, 1515). Thus, plaintiff's principal witness, Caravetta, testified that Tumminello did not have the state of mind necessary to constitute fraud.

■ Plaintiff argues that this court should infer such intent because Philips offered special promotions shortly after these alleged agreements were made. Plaintiff claims that it was only because of these oral agreements that Caravetta agreed to sign the subsequent written agreements. Yet, the testimony is undisputed that both Caravetta and Howell knew of Philip's "Fall Harvest" promotion before the written agreements were signed. (Tr. 1075–1077). Plaintiff has failed to show that Tumminello possessed the requisite state of mind.

Therefore, this court must dismiss plaintiff's claim for fraud.

For all of the foregoing reasons, defendant's motion under Rule 41(b) to dismiss the complaint in this action is granted.